No. _____

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE APPLE IPHONE ANTITRUST LITIGATION

On Petition for Permission To Appeal from the
United States District Court for the Northern District of California
Case No. 4:11-cv-6714-YGR, Hon. Yvonne Gonzalez Rogers

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

Betsy C. Manifold
Rachele R. Byrd
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101
Tel.: (619) 239-4599

Mark C. Rifkin
Matthew M. Guiney
Thomas H. Burt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600

David C. Frederick
Aaron M. Panner
Kyle M. Wood
Kelley C. Schiffman
Alex P. Treiger
Caroline A. Schechinger
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900

*Counsel for Plaintiffs-Petitioners*

November 10, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................... ii

INTRODUCTION ................................................................................1

QUESTION PRESENTED ...................................................................2

RELIEF SOUGHT ...............................................................................3

BACKGROUND ..................................................................................3

REASONS FOR GRANTING THE PETITION ...................................13

I.     The District Court Misapplied *Olean*'s Predominance Analysis .................14

II.    The District Court's Ruling Is Inconsistent With *Briseno* ............................18

III.   The District Court Order Is A Death Knell For Plaintiffs' Claims .................22

CONCLUSION ..................................................................................24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

i

## TABLE OF AUTHORITIES

Page

**CASES**

*Apple Inc. v. Pepper*, 587 U.S. 273 (2019) ............................................................3

*Arizona Theranos, Inc., Litig.*, *In re*, 2021 WL 6124872
  (D. Ariz. Dec. 23, 2021) ...................................................19

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) ................2, 13, 18,
  19, 20, 21

*Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590 (C.D. Cal. 2021)............................19

*Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005)........................14, 22

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023),
  *cert. denied*, 144 S. Ct. 681 & 682 (2024) .......................................................4

*JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, *In re*,
  609 F. Supp. 3d 942 (N.D. Cal. 2022)...........................................................19

*Leyva v. Medline Indus., Inc.*, 716 F.3d 510 (9th Cir. 2013)..................................16

*Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011 (9th Cir. 2024),
  *cert. denied*, 145 S. Ct. 1308 (2025)......................................................... 16-17

*Norton v. LVNV Funding, LLC*, 2020 WL 5910077 (N.D. Cal.
  Oct. 6, 2020) ................................................................19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ...........................................1, 7, 12, 13,
  14, 15, 17, 18

*Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016).....................13

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) .........................................14

*Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150
  (9th Cir. 2016) ................................................................17

*Victorino v. FCA US LLC*, 2020 WL 2306609 (S.D. Cal. May 8, 2020)...............19

*Williams v. Apple, Inc.*, 338 F.R.D. 629 (N.D. Cal. 2021) ...........................2, 19, 20

ii

**STATUTES AND RULES**

Sherman Act, 15 U.S.C. § 1 *et seq.* ............................................................4

   § 2, 15 U.S.C. § 2 ...................................................................................4

Fed. R. Civ. P.:

   Rule 23 .............................................................................................6, 18

      advisory committee's note to 1966 amendment .................................19

   Rule 23(b)(3) .........................................................................................2

   Rule 23(c)(2)(B) ...................................................................................23

   Rule 23(f) .........................................................................1, 2, 3, 7, 13, 22, 24


**OTHER MATERIALS**

Defs.' Notice of Suppl. Authority ISO Defs.' Opp. to Pls.' Mot. for
   Class Certification, *Carbone v. Brown Univ.*, No. 1:22-cv-
   00125, Dkt. 1197 (N.D. Ill. Oct. 28, 2025) .....................................23

Defs.' Reply ISO Motion To Strike Pls.' Mot. for Class Certification,
   *Batton v. NAR*, No. 1:21-cv-00430, Dkt. 255 (N.D. Ill. Nov. 3,
   2025) ................................................................................................23

Defs.' Statement of Recent Decision, *In re California Bail Bond
   Antitrust Litig.*, No. 4:19-cv-00717-JST (DMR), Dkt. 612
   (N.D. Cal. Oct. 29, 2025) .................................................................23

## INTRODUCTION

Plaintiffs represent a class of nearly 200 million purchasers of apps and in-app content from Apple's App Store who overpaid because Apple unlawfully monopolized those sales. After this case made previous trips to this Court and the Supreme Court, in 2024 the district court certified the class and this Court denied Apple's petition for interlocutory review. But just three months before the trial date of February 2, 2026, and days before Plaintiffs were to distribute notice, the court granted Apple's motion to decertify the class for one reason only: that Plaintiffs had, *before trial*, failed to precisely match App Store transactions with the individuals who paid for them.

The district court's decertification order warrants this Court's review under Federal Rule of Civil Procedure 23(f). The order is manifestly erroneous. Its determination that the difficulty of matching transactions to individual class members *before trial* defeats predominance conflicts with this Court's precedents and invites intolerable gamesmanship. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc) (predominance requires showing only common *method* of resolution).

Plaintiffs demonstrated that they could, on a class-wide basis, calculate the overcharge incurred on every App Store transaction, and Apple represented to the court that it would produce to Plaintiffs information sufficient to associate every

transaction with an individual purchaser. Successfully performing that matching – useful for determining the damages due to each class member – is a matter of *post-trial* claims administration that cannot be a basis for denying certification. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017). Another court in this Circuit applied *Briseno* to reject Apple's argument that potential difficulty in determining which individuals in the class incurred damages could defeat predominance. *See Williams v. Apple, Inc.*, 338 F.R.D. 629 (N.D. Cal. 2021) (Koh, J.). The conflict between these decisions adds to the importance of review.

Rule 23(f) is tailor-made for this case. Millions of consumers have been harmed to the tune of $20 billion, and they have been awaiting their day in court for more than a decade. The importance of the district court's ruling goes beyond threatening to end this litigation: defendants across the country have read the court's decision to impose a requirement of pre-trial identification of class members that erects a new and practically insurmountable hurdle to certification. Review should be granted.

## QUESTION PRESENTED

Whether the district court manifestly erred in applying the predominance requirement of Rule 23(b)(3) by requiring Plaintiffs to ascertain individualized damages before trial so as to ensure the class definition primarily encompassed harmed individuals, especially as Plaintiffs showed (without ascertaining

individualized damages) that the proportion of class members without measurable damages is well under 10%.

## RELIEF SOUGHT

The Court should grant Rule 23(f) review and remand with instructions to re-certify the class.

## BACKGROUND

1.     Apple launched the App Store in July 2008.  The App Store is a monopoly:  it is the *only* place where iPhone and iPad users can buy apps and many in-app digital goods, such as subscriptions, in-game currency, or ad-free experiences.  Dkt. 1031-3 at 1, 13 (Facts 2, 27-28).  Apple enforces its App Store monopoly through a variety of anticompetitive contractual restrictions (including licensing and warranty agreements) and technical restrictions that prevent users from purchasing apps (and much in-app content) anywhere but the App Store. *Id.* at 13-14, 17-18 (Facts 28, 30, 47-55).

"iPhone owners purchase apps directly from the retailer Apple." *Apple Inc. v. Pepper*, 587 U.S. 273, 281 (2019).  When a customer clicks "purchase," Apple collects the full payment amount from the consumer; delivers the digital product to the consumer; and later remits to the app developer its share of the purchase price. Dkt. 1031-3 at 16-18 (Facts 42, 52).  Since July 2008, Apple – with few exceptions – has collected a 30% commission on every app and in-app purchase, *id.* at 5, 19

(Facts 10, 60-61), allowing it to reap "extraordinarily high" profit margins that "have exceeded 75% for years." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984-85 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 & 682 (2024); *see* Dkt. 1052-3 ¶ 51 & tbl. 10. Without Apple's anticompetitive restrictions, competition in the distribution of apps and in-app content would have reduced the commission Apple could charge by more than half. Dkt. 1031-3 at 19 (Fact 62). Apple's supracompetitive commission rate harms iPhone and iPad users because it leads app developers to set higher prices; consequently, consumers have paid Apple more than $20 billion in overcharges for apps and in-app content. Dkt. 1052-25 ¶ 84 & fig. 13.

**2.** In 2011, Plaintiffs Robert Pepper and Stephen Schwartz sued Apple under Section 2 of the Sherman Act, 15 U.S.C. § 2, seeking damages. Dkt. 1. Together with Plaintiff Edward Lawrence, Dkt. 183, they assert monopolization and attempted monopolization claims both individually and on behalf of a class.

In discovery, Apple produced a massive amount of transaction data recording every purchase of digital content from the App Store. To establish antitrust injury and damages on a class-wide basis, Plaintiffs developed a method to evaluate the overcharge associated with *each* transaction. Drawing on the expertise of multiple economists, including Nobel-Prize-winning econometrician Daniel McFadden, Plaintiffs developed a model that calculated – for each digital

purchase – the but-for price, that is, the price that consumers would have paid if Apple had charged a lower commission. (The but-for commission rate was calculated by another economist, Dr. Rosa Abrantes-Metz.) Another expert econometrician, Dr. Minjae Song, has overseen implementing Professor McFadden's model. Transaction by transaction, Professor McFadden's model demonstrates that, for almost all purchases, the price in the "but-for" world would have been lower than the price Apple charged; for a small proportion of transactions, the "but-for" price would have been slightly higher. Apple challenged Plaintiffs' experts under *Daubert*, but those challenges were denied. Dkt. 789 at 6-23.

Plaintiffs also showed that they could, without individualized inquiry, identify class members without measurable damages and confirm that the proportion of such class members was small. iPhone and iPad users "make purchases on the App Store through 'Apple IDs,' which are unique, password-protected accounts" registered to a primary email address. Dkt. 476-12 ¶ 2. As the data was produced by Apple, each App Store transaction was associated with a randomized string of alphanumeric characters, called a "hash value," that substituted for the consumer's Apple ID. Dkt. 1052-25 ¶ 21. The parties and the district court have referred to these hash values as "Apple IDs."

By aggregating the transactions for a particular Apple ID, Plaintiffs showed they could calculate the damages associated with that Apple ID – which in most cases was a positive damages amount.  Dkt. 679-1 ¶¶ 41-43, 90, 95.  And by performing these calculations for each Apple ID, Plaintiffs proffered a class-wide damages estimate representing an "exact summation of individual account damages."  *Id.* ¶ 43.

Plaintiffs also determined a significant number of Apple IDs existed with a very low volume of associated purchases; such Apple IDs, though numerous, accounted for a very small percentage of purchases.  *Id.* ¶ 96 fig. 7.  Accordingly, Plaintiffs revised the class definition to exclude purchasers with less than $10 of spending in the App Store through a single Apple ID during the class period.  As approved by the district court, the class definition is:

> **All persons in the United States**, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, **who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases**, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period").  **The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account**.

Dkt. 789 at 2 (emphases added).

**3.**    The district court granted Plaintiffs' motion for class certification in February 2024.  To show that Rule 23's requirements were satisfied, Plaintiffs

relied on a subset of transaction data that included every purchase made in the App Store's Music, Games, and Entertainment genres through April 2022 – comprising "70 percent of the commerce on the App Store." Dkt. 736 at 73:23-74:1; *see* Dkt. 679-1 ¶ 15. Professor McFadden identified precisely which accounts were harmed and estimated class-wide damages for those accounts. Dkt. 679-1 ¶¶ 43, 72-79. The court concluded Plaintiffs could use the model to "show the impact of Apple's allegedly anticompetitive conduct across all class members." Dkt. 789 at 26.

The district court also considered during class certification whether the percentage of uninjured class members meant individual issues concerning antitrust injury would predominate. *Id.* at 24 & n.18. Using the same subset of transaction data, Plaintiffs showed that, after applying the $10 spending threshold, 92.1% of the remaining Apple IDs, accounting for approximately 99% of spending, had measurable damages. Dkt. 786-1 ¶¶ 9-10; Dkt. 679-1 ¶ 78 & fig. 6. The court held that Plaintiffs' showing satisfied *Olean* because that case "rejected the argument that 'Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members.'" Dkt. 789 at 25 (quoting *Olean*, 31 F.4th at 669); *see id.* at 27 ("*Olean* . . . rejected the argument that Rule 23 has an uninjured class member cutoff"). Apple sought review of the certification order under Rule 23(f), which this Court denied. Order, *Pepper v. Apple Inc.*, No. 24-875, Dkt. 17 (9th Cir. May 24, 2024).

**4.** In certifying the class, the district court also stated its expectation that Plaintiffs would "calculate both aggregate and individual damages *before trial* with the full transactions data of the entire App Store." Dkt. 789 at 24 n.17. The court further stated it would not suffice to calculate damages for each Apple ID; instead, Plaintiffs would have to "match the Apple [IDs] . . . with *actual consumers*." *Id.* at 1. "Should Professor McFadden's model fail to do [so], the Court will consider whether modification or decertification is appropriate for all or part of the class." *Id.* The court's order offered little explanation for these requirements other than the need to "satisf[y] the predominance requirement." *Id.* at 1, 24 n.17.

To comply with the district court's additional requirements, Plaintiffs asked Apple to provide the data to match Apple IDs with individual class members. Apple admitted it possessed the personal identifying information of App Store customers that would allow Plaintiffs "to demonstrate which App Store transactions are tied together by a common payor so that they can net out which payors have alleged damages and which do not." Dkt. 815 at 5. Yet Apple only agreed to produce records containing the personal identifying information for these "payors"; it refused to produce data linking those payor records to specific transactions. *See id.*

The district court-mandated matching exercise turned out to present several difficulties. To begin with, there is not a one-to-one correspondence between individual App Store customers and Apple IDs: some customers have used more

8

than one Apple ID, and more than one individual may have paid for purchases under a single Apple ID. Dkt. 476-12 ¶¶ 2-5. In addition, when Plaintiffs asked Apple to identify which class members were associated with each Apple ID, Apple produced a list of over one billion "payors"; each payor record was associated with an Apple ID. Dkt. 815 at 4-5; Dkt. 1035-14 at 1. But a "payor record" is not the same as an individual class member: "a new record is created each time the [purchaser] creates a new Apple ID account or changes their name, address, or payment method." Order 5. Accordingly, under the court-ordered approach, matching transactions to class members first required grouping together "payor records" that correspond to the same individual.

Doing that, however, required certain judgment calls to determine whether two payor records are associated with the same individual – individuals can use nicknames, change addresses or use fictitious addresses, change their last names after marriage, obtain new credit cards, and so forth. Plaintiffs accordingly retained Darryl Thompson – an expert in data deduplication who has conducted or supervised thousands of class administration processes – to determine which Apple payor records should be grouped together as belonging to a single purchaser. Dkt. 1052-32 ¶¶ 3, 8-9. In performing that exercise, Mr. Thompson generally erred on the side of treating two similar payor records as associated with different purchasers, even if there were indications that the two payors were the same person;

9

this was conservative, as it tended to reduce the spending attributed to each class member (thus overestimating the number of class members without measurable damages).[1] Of those unique purchasers that Mr. Thompson identified, *see id.* ¶¶ 18-20; Dkt. 1031-6 ¶ 40, Dr. Song determined that upwards of 200 million qualified for class membership, Dkt. 1052-25 ¶ 74.[2] Applying Professor McFadden's damages model, Dr. Song determined that less than 6% of class members (accounting for only 0.5% of all App Store spending) had no measurable damages. *Id.* ¶ 83 & fig. 13. Unlike Plaintiffs' earlier calculation during class certification from a sample of App Store transaction data, these calculations were based on the full transaction dataset and yielded an even lower percentage of class members without damages than the earlier calculation.

Plaintiffs also introduced (although the district court refused to consider) a supplemental report from Dr. Song showing that, when aggregating transaction-

---

[1] An additional challenge was that, when it first produced a sample of the data, Apple produced hash values of only the last four digits of credit card numbers. Dkt. 1035-14 at 1. Although subsequent productions included hashed value for full credit card numbers – which would have been more useful in grouping payor records – Apple never corrected its prior representation that only the last four digits were included. Order 22 & n.19; *see* Dkt. 1061-2.

[2] In decertifying the class, the court opined that what matters in applying the $10 threshold is not whether someone purchased $10 or more "from any one Apple ID account," *see* Dkt. 789 at 2, but rather whether someone purchased $10 or more from "one[] or . . . *more than one* [Apple ID account]." 10/14/25 Hr'g Tr. 13:11-14:11. That distinction goes beyond the class definition but does not affect Plaintiffs' ability to identify class members and allocate damages.

10

level overcharges *by Apple ID* on the complete transaction dataset to estimate class-wide damages, the numbers were virtually the same as with Mr. Thompson's grouping: less than 6% of the Apple IDs surpassing the $10 spending threshold (again accounting for just 0.5% of all App Store spending) suffered no measurable damages. Dkt. 1052-26 ¶ 3 & fig. 1; *see* Dkt. 1062 at 27:9-30:10 (relevant ruling). That consistency is no surprise: a 99.9% overlap in the App Store transactions giving rise to potential damages exists whether transactions were included based on Mr. Thompson's grouping of payors or on Apple IDs. Class-wide damages were also virtually the same: between $20.2 and $20.4 billion using either method. Dkt. 1031-2 ¶ 8; Dkt. 1052-25 ¶ 84 & fig. 13; Dkt. 1052-26 fig. 1.

5.  Apple moved to exclude Mr. Thompson's report (Dkt. 1002-1) and to decertify the class (Dkt. 1006); the district court granted both motions.

With respect to the *Daubert* motion, the court first found Mr. Thompson to be unqualified and his approach to grouping payor records were irrelevant because he grouped payor records by name rather than grouping payor records "via payment method." Order 21-22 & n.18. The court did not square this holding with the subsequent acknowledgement that grouping payor records by payment method was not feasible because Apple did not disclose that it had provided Plaintiffs usable payment method data until the October 2025 hearing. *See* Order 22 n.19; Dkt. 1061-2. Plaintiffs subsequently requested a hearing so Mr. Thompson could testify

how he *could* have used full credit card numbers to improve the accuracy of his grouping, Dkt. 1065-2 at 2, but the court refused to hold one, Order 1 n.2.

The court also focused on two anomalous results produced by Mr. Thompson's method: failure in some instances to group records together where first names do not match exactly (e.g., Rob and Robert); and grouping a set of records together (e.g., associated with the first name "Kim") when each of them had used both the same fictitious addresses and (hashed) phone number. *See* Order 17-20. In his declaration supporting Plaintiffs' *Daubert* opposition, Mr. Thompson explained these errors had a miniscule impact on his overall groupings and were driven by Apple's data-keeping practices and production. Dkt. 1031-6 ¶¶ 37-39.

Proceeding to Apple's decertification motion, the court concluded that exclusion of Mr. Thompson's report "alone requires [class] decertification." Order 25. The court reiterated it had expected Plaintiffs to "match Apple ID accounts with *actual consumers*" before trial to determine the number of class members without measurable damages. Order 1. But "[w]ithout the Thompson report," Plaintiffs (1) have "no methodology to match Apple ID accounts to consumers, and therefore no way to show that antitrust injury is 'capable of being established through a common body of evidence,'" Order 25 (quoting *Olean*, 31 F.4th at 666); and (2) cannot "reliably limit the percentage of uninjured class members, such that the Court may determine whether the class is 'fatally overbroad,'" Order 27 (quoting *Olean*, 31 F.4th at 669 n.14).

## REASONS FOR GRANTING THE PETITION

In granting Apple's motion to decertify the class, the district court failed to apply the predominance standards this Court articulated in *Olean*. The presence of class members without measurable damages does not defeat predominance, *see Olean*, 31 F.4th at 669 & n.13, particularly when – as here –the entire class unquestionably was "*exposed* to the challenged conduct," *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136-37 (9th Cir. 2016) ("the possibility that an injurious course of conduct may sometimes fail to cause injury to certain class members . . . fails to reveal a flaw that may defeat predominance"). In deviating from this precedent, the court effectively imposed the very requirement that this Court *disapproved* in *Briseno* – requiring Plaintiffs to identify each and every class member as a condition of certification. The court never should have imposed the requirement that Plaintiffs "calculate . . . individual damages *before trial*" as a condition of maintaining this case as a class action, and its ruling that apparent deficiencies in matching transactions to individual class members warranted decertification was plainly erroneous. Apple has not claimed, and the district court did not conclude, that any defects in Thompson's grouping exercise suggest that the damages issues cannot be addressed on a class-wide basis through Professor McFadden's model, with individual damages appropriately allocated after trial.

Review under Rule 23(f) is "most appropriate" when a class-certification order is "manifestly erroneous," presents "an unsettled and fundamental issue of

law relating to class actions," or poses "a death-knell situation" and rests on "questionable" grounds. *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005) (per curiam). Those standards are met. The upshot of the district court's decision is that upwards of 200 million consumers with collectively $20 billion in damages must sue individually to recover against Apple, a $4 trillion corporation, because of perceived uncertainty in identifying before trial consumers who account for just 0.5% of all App Store spending. That manifest legal error threatens grave injustice. Plaintiffs' petition should be granted.

## I.    The District Court Misapplied *Olean*'s Predominance Analysis

In holding that Plaintiffs needed to calculate individual damages for every class member as a condition of class certification, the district court contradicted the predominance standards articulated in *Olean*. " 'The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.' " 31 F.4th at 664 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Accordingly, Plaintiffs can show that individualized issues related to injury and damages do not defeat predominance by proffering a damages model "capable of establishing antitrust impact on a class-wide basis." *Id.* at 682; *cf. id.* at 669 n.13 (class cannot be certified when there is no way "short of full-blown, individual trials" to determine whether class members were injured).

14

Plaintiffs have advanced a damages model "capable of establishing antitrust impact on a class-wide basis." The district court acknowledged as much in its February 2024 class-certification order, noting that "Professor McFadden's model can show the impact of Apple's allegedly anticompetitive conduct across all class members." Dkt. 789 at 26. That conclusion – which this Court earlier declined to review – was correct. Professor McFadden's model allows Plaintiffs to calculate, on a transaction-by-transaction basis, a "but-for" price for the digital good, that is, the price that the consumer would have paid had Apple charged a lower commission. Dkt. 442-11 ¶¶ 177-208, 233-238. Class-wide damages are simply the sum of those overcharges. Dkt. 1052-25 ¶¶ 61, 67; Dkt. 679-1 ¶¶ 41-43.

Plaintiffs' damages model is likewise "capable of resolving the antitrust impact issue in a single stroke." *Olean*, 31 F.4th at 683. For any individual class member, damages can be calculated by aggregating the damages from each of that class member's purchases using the very same model the district court earlier approved. And Plaintiffs used a variety of methods to show that the proportion of class members *without* measurable damages is quite small. In certifying the class in February 2024, the district court credited Plaintiffs' estimate (based on Apple IDs for a subset of App Store genres) that uninjured class members were limited to less than 8% of all Apple IDs and accounted for about only 1.1% of spending. Using the full App Store data, the proportion of class members without measurable

damages is even lower. Whether transactions are grouped by class member (using Mr. Thompson's payor-record groupings) or by Apple ID (as was done at the certification stage), Plaintiffs showed that the percentage of class members without measurable damages was less than 6%, accounting for only 0.5% of overall spending.

The district court evidently believed that, because it found Mr. Thompson's payor-record groupings unreliable, Plaintiffs had failed to establish a class-wide method for discerning class members with measurable damages from those without. But any purchaser who has spent more than $10 in the App Store through any one Apple ID during the class period is a class member, and that class member has measurable damages if the sum of overcharges associated with each of their purchases is positive. The trial will not require identifying which specific transactions are associated with which specific class members. Determining which Apple IDs are associated with which class members will affect the ultimate damages allocated to each class member, but that is a matter of claims administration, not an issue for trial. The fact that *individual* damages must be assessed during post-trial claims administration is no hurdle to predominance, as courts have routinely recognized. *See Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."); *see also Lytle v. Nutramax Lab'ys, Inc.*,

114 F.4th 1011, 1026-27 (9th Cir. 2024) (similar), *cert. denied*, 145 S. Ct. 1308 (2025); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (similar).

Nor is there any basis to question Plaintiffs' showing that the proportion of uninjured class members is not only identifiable but quite small. *Cf. Olean*, 31 F.4th at 669 n.14 (district court should consider whether "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed"). To be sure, estimating the percentage of class members without measurable damages using either Apple IDs alone or Mr. Thompson's grouping of Apple's imperfect payor records is not *quite* the same as performing that estimate for individual human beings. But the distinction does not make any material difference: Plaintiffs have shown that, when a person has made at least $10 in purchases in the App Store through one Apple ID, the person is very likely to have measurable damages. After all, the data strongly indicates that many of the Apple IDs *do* correspond one-to-one with purchasers. Dkt. 1052-25 ¶ 74 (class members who spent over $10 using at least one Apple ID); Dkt. 1052-26 fig. 1 (Apple IDs with spending over $10). Grouping multiple Apple IDs together simply makes it *more* likely that the associated individual has suffered damages. Dkt. 679-1 ¶ 78 (two-thirds of all Apple IDs without measurable damages spent less than $10). Whether the grouping occurs by class member or Apple ID, the

same transactions form the basis of the damages estimate and the damages estimate is the same. Dkt. 1031-2 ¶ 8 (99.9% overlap in transactions when grouping by Apple ID and by class member – rendering any difference truly marginal). Apple knows how to run Professor McFadden's model and has easier access to all purchaser data than Plaintiffs. And it has never argued – let alone supplied evidence to show – that the percentage of uninjured class members exceeds Plaintiffs' estimates.

## II. The District Court's Ruling Is Inconsistent With *Briseno*

The district court's analysis not only ran afoul of *Olean*'s predominance standards, but also contradicts the rationale of *Briseno*, which held that plaintiffs are not required to identify individual class members at the class-certification stage. Indeed, the court's analysis effectively read into the predominance standard an ascertainability requirement, in direct contradiction of *Briseno*.

In *Briseno*, the district court certified a class of purchasers of vegetable oil. The defendant asserted on appeal that the class was unadministrable because it would be practically impossible reliably to identify retail purchasers. This Court affirmed, holding that Rule 23 does *not* require plaintiffs to "demonstrate that there is an 'administratively feasible' means of identifying absent class members" to certify a class. 844 F.3d at 1123. "Rule 23 specifically contemplates" that *post-trial claims administration* proceedings will require "individualized claim

18

determinations after a finding of liability." *Id.* at 1131 (citing Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment). And due process does not require that absent class members be identified "with perfect accuracy at the certification stage"; indeed, certification is appropriate even when "it might be *impossible* to identify some class members." *Id.* at 1129, 1132.

District courts in this Circuit have applied *Briseno* to reject arguments, like Apple's here, that each member of a proposed class that suffered damages must be identified before trial to satisfy predominance.[3] In *Williams v. Apple*, plaintiffs moved to certify a class of consumers who purchased subscriptions to Apple's iCloud service. 338 F.R.D. at 645. Apple opposed certification, arguing that individual issues predominated because "some iCloud users are on family plans, which take payment from only one family member at a given time," and it was "infeasible to determine *who* in a family plan 'paid for the subscription' and thus is a member of the Damages Class." *Id.* (cleaned up). The district court found that *Briseno* "forecloses Apple's argument." *Id.* "[A]s in *Briseno*, the administrative feasibility of identifying who paid for the product at issue—and thus could be a

---

[3] *See, e.g.*, *Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 602 (C.D. Cal. 2021); *Victorino v. FCA US LLC*, 2020 WL 2306609, at *3 (S.D. Cal. May 8, 2020); *Norton v. LVNV Funding, LLC*, 2020 WL 5910077, at *11 (N.D. Cal. Oct. 6, 2020); *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 966 n.11 (N.D. Cal. 2022); *see also In re Arizona Theranos, Inc., Litig.*, 2021 WL 6124872, at *3 (D. Ariz. Dec. 23, 2021).

member of the Damages Class—is immaterial to class certification" because "a claims administration process would suffice to show membership in [the] class." *Id.* The "asserted difficulty of identifying 'who paid for a subscription to iCloud' is no bar to predominance." *Id.* at 646.

*Briseno* illustrates why the district court manifestly erred in holding that uncertainty about the identity of the individual paying for a particular transaction could affect the certifiability of the class. *See* Order 20-22, 25-26. First, because each App Store transaction is associated with a payment card, there is no uncertainty. Second, post-trial administration of the claims can allocate damages to individuals. Class members can demonstrate their entitlement to the damages associated with specific purchases; for each set of purchases, damages can be calculated using Professor McFadden's model. *See Briseno*, 844 F.3d at 1131-32 (defendant can "individually challenge the claims of absent class members if and when they file claims for damages" during "the claims administration stage"); *Williams*, 338 F.R.D. at 646.

To try to distinguish this case from *Briseno*, Apple may say that, without certainty as to which transactions should be matched with which class members, there is no way to be certain which class members suffered damages, because not *every* purchase transaction leads to positive damages. But *Briseno* illustrates why this is, if anything, a surmountable problem of post-trial claims administration and

not an issue affecting predominance. Here, class members are defined according to "objective criteri[a]." *Briseno*, 844 F.3d at 1124. If an Apple consumer spent more than $10 on the App Store from any one Apple ID account, they are in the class. They can be given notice and choose to opt out. If they remain in the class, after trial, they will have the opportunity to assist with the accurate allocation of damages by helping to clarify which transactions are theirs. If their purchases do not exceed $10 by much, they may not recover. The district court's alternative approach – as *Briseno* recognized – shields a wrongdoer from liability by making it practically impossible for most plaintiffs to obtain redress.

The district court's error is compounded by the fact that this case does not have any of the ascertainability problems that gave rise to the issue in *Briseno*. In *Briseno*, the transactions were over-the-counter retail transactions; no clean records existed linking the transaction to a putative class member. *Id.* at 1125. Even there, this Court held that administrative difficulties in identifying class members did not bar certification. *Id.* at 1131-33. But this case is the exact opposite – every transaction is documented to an Apple ID, and every Apple ID is tied to purchaser information. There is no missing information. Apple has the relevant data. The only issue is deploying the data properly. Plaintiffs' first effort to do so met with limitations, but those limitations were traceable to Apple's data problems. Given the presence of that data, the only problem is perfecting the method of mining it

21

for damages-allocation purposes at the end of the case – a process that can often take multiple iterations in generating a claims process. Put simply, if there is an ascertainability issue here – which the court mistook for an issue of predominance – it is entirely of Apple's making.

## III. The District Court Order Is A Death Knell For Plaintiffs' Claims

Rule 23(f) review is further warranted because the district court's order creates "a death-knell situation" for Plaintiffs on grounds that are, at a minimum, "questionable." *Chamberlan*, 402 F.3d at 959.

Plaintiffs' "individual claim[s] . . . , without the class, [are] worth far less than the cost of litigation." *Id.* at 957-58. The class consisted of nearly 200 million members who, over the course of nearly 17 years, collectively paid Apple over $20 billion in overcharges for apps and in-app content on their iPhones and iPads. *See* Order 6. On the other hand, the individual claims of the three named Plaintiffs are collectively worth $268. Dkt. 1059-1, Ex. 1 ¶ 4. Courts routinely recognize that such claims are "too small to justify the expense of litigat[ing]" through trial to a final judgment to obtain appellate review. *Chamberlan*, 402 F.3d at 957-58.

Review also is warranted because the district court's order invites gamesmanship. Apple insists class members are defined according to who paid for particular transactions; Apple admits possessing that information but resisted providing it. Instead, grouping "payors" became an exercise in cleansing data the

22

accuracy of which Apple itself consistently disclaimed. Apple used its poor data quality as a shield, *see* Dkt. 1035-15 at 2 (disclaiming data reliability), and the district court turned it into a sword, *see* Order 25 n.20 ("Consumer plaintiffs also attempt to blame Thompson's errors on Apple's data keeping practices. They cannot do so[.]").

Ultimately, none of this should have been necessary, and it certainly should not matter for class certification; after all, Plaintiffs were able to show, before trial, that class members responsible for 99.5% of all App Store spending have measurable damages.[4] But in many complex antitrust cases, the calculation of individual damages may present data challenges. Already, defendants in other cases have seized on the district court's order in this case to argue that a failure precisely to identify who paid for a particular good or service should preclude class certification.[5] This Court's decisions, however, reject that approach. Review is required.

---

[4] Indeed, the parties *jointly* proposed a plan for distributing class notice that involved sending direct email notice to class members identified by Mr. Thompson. Dkt. 1020 at 3. Apple never contended that using Mr. Thompson's analysis would make the notice plan inadequate. *See* Fed. R. Civ. P. 23(c)(2)(B).

[5] *See* Defs.' Statement of Recent Decision, *In re California Bail Bond Antitrust Litig.*, No. 4:19-cv-00717-JST (DMR), Dkt. 612 (N.D. Cal. Oct. 29, 2025); Defs.' Notice of Suppl. Authority ISO Defs.' Opp. to Pls.' Mot. for Class Certification, *Carbone v. Brown Univ.*, No. 1:22-cv-00125, Dkt. 1197 (N.D. Ill. Oct. 28, 2025); Defs.' Reply ISO Motion To Strike Pls.' Mot. for Class Certification at 5 n.6, *Batton v. NAR*, No. 1:21-cv-00430, Dkt. 255 (N.D. Ill. Nov. 3, 2025).

## CONCLUSION

This Court should grant Plaintiffs' Rule 23(f) petition.

Date:  November 10, 2025                    Respectfully submitted,


                                                       /s/ David C. Frederick

Betsy C. Manifold                          David C. Frederick
Rachele R. Byrd                            Aaron M. Panner
WOLF HALDENSTEIN ADLER                     Kyle M. Wood
  FREEMAN & HERZ LLP                       Kelley C. Schiffman
750 B Street, Suite 1820                   Alex P. Treiger
San Diego, CA 92101                        Caroline A. Schechinger
Tel.: (619) 239-4599                       KELLOGG, HANSEN, TODD,
manifold@whafh.com                            FIGEL & FREDERICK, P.L.L.C.
byrd@whafh.com                             1615 M Street, N.W., Suite 400
                                           Washington, D.C. 20036
Mark C. Rifkin                             Tel.: (202) 326-7900
Matthew M. Guiney                          dfrederick@kellogghansen.com
Thomas H. Burt                             apanner@kellogghansen.com
WOLF HALDENSTEIN ADLER                     kwood@kellogghansen.com
  FREEMAN & HERZ LLP                       kschiffman@kellogghansen.com
270 Madison Avenue                         atreiger@kellogghansen.com
New York, NY 10016                         cschechinger@kellogghansen.com
Tel.: (212) 545-4600
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com


*Counsel for Plaintiffs-Petitioners*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing petition complies with the word limit of Ninth Circuit Rules 5-2(b) and 32-3(2) because it contains 5,588 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Ninth Circuit Rule 5-2(b).

I further certify that the foregoing petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point, Times New Roman font.

/s/ *David C. Frederick*
*Counsel for Plaintiffs-Petitioners*

November 10, 2025

# CERTIFICATE OF SERVICE

I hereby certify that, on this 10th day of November 2025, I caused the foregoing **Petition for Permission To Appeal Pursuant to Federal Rule of Civil Procedure 23(f)** to be submitted electronically with the Clerk of the Court through the Court's appellate ECF system.

I further certify that, on this date, the foregoing petition was served by electronic mail and overnight mail upon the following:

Cynthia E. Richman
crichman@gibsondunn.com
Harry R. S. Phillips
hphillips2@gibsondunn.com
GIBSON, DUNN & CRUTCHER
  LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel.: (202) 955-8500

Theodore J. Boutrous Jr.
tboutrous@gibsondunn.com
Daniel G. Swanson
dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER
  LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: (213) 229-7000

Caeli A. Higney
chigney@gibsondunn.com
Julian W. Kleinbrodt
jkleinbrodt@gibsondunn.com
Dana L. Craig
dcraig@gibsondunn.com
Eli M. Lazarus
elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER
  LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel.: (415) 393-8200

*Counsel for Defendant-Respondent Apple Inc.*

/s/ *David C. Frederick*
*Counsel for Plaintiffs-Petitioners*

# ADDENDUM VOL I

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

IN RE APPLE IPHONE ANTITRUST LITIGATION

Case No. 4:11-cv-6714-YGR

**ORDER GRANTING APPLE'S *DAUBERT* MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DARRYL THOMPSON AND MOTION TO DECERTIFY THE CLASS**

Re: Dkt. Nos. 1001, 1005, 1059, 1064, 1066

Pending before the Court are two motions: Apple, Inc.'s *Daubert*[1] Motion to Exclude the Expert Testimony of Darryl Thompson (Dkt. No. 1001) and Apple's Motion to Decertify the Class. (Dkt. No. 1005.) Almost two years ago, the Court certified a class of consumer plaintiffs over Apple's objection and accepted plaintiffs' representation that their experts could match Apple ID accounts with *actual consumers,* and with this methodology, could in turn determine (within reasonable parameters) whether and to what extent consumer class members were harmed. (Dkt. No. 789 at 1.) In that order, the Court warned that should plaintiffs' expert fail to do so, it would consider decertifying the class. (*Id.*) The expert—on which plaintiffs *chose* to rely—could not do so and instead conducted an error-ridden "matching" attempt. As explained in more detail below, because plaintiffs' process is not sufficiently reliable, the Court **GRANTS** Apple's *Daubert* motion and, as a result, Apple's motion to decertify the class.[2]

## I.   BACKGROUND

### A.   FACTUAL BACKGROUND

The facts of this case are well known to the parties. The Court provides some basic background and facts upon which the decision relies.

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[2] The Court denies consumer plaintiffs' repeated and belated request to hold an evidentiary hearing on Apple's *Daubert* motion related to Darryl Thompson. (Dkt. No. 1064.) The Court has reviewed Thompson's reports and deposition testimony. No further explanation is needed.

United States District Court
Northern District of California

Consumer plaintiffs allege that Apple charges iPhone operating system ("iOS") app developers a supracompetitive commission, which developers then pass on to consumers through charging higher prices to download an app or make in-app purchases. (Dkt. No. 228, Third Amended Complaint, ¶¶ 4–6, 9, 47.) Plaintiffs allege that Apple's conduct allowed it to unlawfully monopolize the aftermarket for iOS apps. (*Id.*) They advance two claims against Apple on behalf of a certified class: (1) unlawful monopolization of the applications aftermarket in violation of Section 2 of the Sherman Act and (2) attempted monopolization of the applications aftermarket in violation of Section 2 of the Sherman Act. Class representatives are Stephen Schwartz, Robert Pepper, and Edward Lawrence ("consumer plaintiffs").[3]

Consumer plaintiffs represent the following class:

> All **persons** in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or **who paid Apple for one or more in-app purchases,** including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). The Class is limited **to those persons who paid more than $10.00 in total** to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account.

(Dkt. No. 789, Order Granting Renewed Motion for Class Certification; emphases supplied.) The class was defined, as the Court has previously explained, to consist of "persons," not Apple accounts.

### B.    PROCEDURAL BACKGROUND

#### 1.    FIRST CLASS CERTIFICATION ORDER – MARCH 2022

Consumer plaintiffs first moved for class certification in June 2021. The Court rejected plaintiffs' motion because it did not satisfy Rule 23(b)(3)'s predominance requirement and could not prove antitrust injury on a classwide basis. (Dkt. No. 630 at 25–26.)

The Court's analysis hinged on Professor Daniel L. McFadden's econometric model and accompanying report. The model attempted to estimate how an app developer's pricing would

---

[3] The Court **GRANTS** consumer plaintiffs' request to voluntarily dismiss the individual claims of plaintiff Edward Hayter. (Dkt. No. 1066.)

1   respond to competitive commission rates. The Court determined that Professor McFadden's

2   model[4] was not reliable, and was therefore excluded, for multiple reasons. ***First***, the model

3   incorporated a cherry-picked "but-for commission rate" of between 10 to 12% that was not rooted

4   in any legitimate scientific, economic, or mathematic principle. (*Id.* at 5.) Professor McFadden

5   was not qualified to opine specifically on app development, pricing, or payment processing. (*Id.*)

6   ***Second***, Apple and its experts identified many confounding errors in the model, including data

7   errors, mixed-up calculation methods, and the failure to account for net harm. (*Id.* at 8–9.) All told,

8   the percentage of uninjured class accounts rose from at least 5.8% to 14.6% after Apple's

9   corrections, which Professor McFadden conceded were appropriate. ***Third***, Professor McFadden's

10  model ignored focal-point and tiered pricing in analyzing the but-for pricing. (*Id.* at 11–12.)

11  ***Fourth*** and finally, Professor McFadden's model was volatile, and consumers might switch

12  between being injured or not depending on the sample size. (*Id.* at 13.) The Court ultimately

13  concluded that consumer plaintiffs did not "meet their predominance burden because they rel[ied]

14  on an unsound methodology, which cannot reliably demonstrate which members, and how many,

15  were injured as common proof of class wide impact" or classwide damages. (*Id.* at 25–26.)

16          **2.      ORDER ON RENEWED MOTION TO CERTIFY CLASS – FEBRUARY 2024**

17          Consumer plaintiffs renewed their motion for class certification in March 2023. This time,

18  the Court found that plaintiffs had proffered a valid methodology to determine injury and damages

19  on a classwide basis. The Court granted the motion and certified consumer plaintiffs' proposed

20  class, with reservations. (Dkt. No. 789.) To remedy prior errors, consumer plaintiffs submitted a

21  supplemental report from Professor McFadden that ostensibly corrected the prior-identified errors

22  and a new expert report from Dr. Rosa Abrantes-Metz, who the Court found was qualified to, and

23  reliably did, calculate the but-for commission rate of 13.63%.

24          On round two, when the Court analyzed predominance, it determined that Professor

25  McFadden's model *was* capable of showing antitrust injury on a classwide basis. (*Id.* at 27.)

26

27          ─────────────────────────
            [4] Professor McFadden's model was created by estimating consumer demand in the iOS

28  aftermarket and developer costs. The model then calibrates but-for pricing based on the "but-for"
    commission rate. (*Id.* at 7.)

United States District Court
Northern District of California

1  Professor McFadden had tweaked his model consistent with the Court's prior opinion and had

2  attempted to reduce the number of uninjured accounts. In the background, consumer plaintiffs

3  narrowed the class definition to apply to "[a]ll persons . . . who paid Apple for one or more in app

4  purchases" which were "more than $10 in total to Apple" from any, and all, of their Apple ID

5  accounts. (Dkt. No. 789 at 25.) That decision eliminated a large portion of uninjured accounts.

6  (*Id.*) Moreover, consumer plaintiffs represented to the Court that the number of uninjured class

7  members would decrease after Apple's payor data—upon which the model was based—was

8  deduplicated. (*Id.*) That step was necessary because there are significantly more Apple ID

9  accounts than payors, meaning a single payor, or consumer, likely has multiple accounts or payor

10 records. (*Id.*)

11      Professor McFadden now estimated that only 7.9% of class accounts were uninjured. (*Id.*)

12 Because consumer plaintiffs had reduced uninjured class accounts and would reduce the number

13 of uninjured class members, the Court agreed that individualized issues of antitrust injury, as

14 proposed, would not predominate, and the "model, once run, will answer the common question of

15 whether Apple's conduct caused class members to suffer an antitrust injury." (*Id.* at 27.)

16      Although the Court certified the class, the Court was transparent about what it expected

17 from consumer plaintiffs to maintain the class. It cautioned:

18          Given the procedural posture of this motion, the Court accepts
           plaintiffs' representation that Professor McFadden can: **(i) match the**
19          **Apple identification numbers he has with *actual consumers*** to
           ascertain class members, and (ii) **limit the percentage of unharmed**
20          **class members** swept in by the narrowed class definition. Should
           Professor McFadden's model fail to do both, the Court will consider
21          whether modification or **decertification is appropriate** for all or part
           of the class.
22

23 (*Id.* at 1; emphases supplied.) The Court explained in its predominance analysis that plaintiffs

24 have "now affirmed to the Court that Professor McFadden will calculate both aggregate and

25 individual damages *before* trial with the full transactions data of the entire App Store." (*Id.* at 24,

26 n. 17.) It was not lost on the Court that running the full analysis would be expensive, and it may

27 have been economically unfeasible to do so before the class was certified. The Court thus allowed

28 consumer plaintiffs to proceed, given their assurances.

United States District Court
Northern District of California

1    In reasoning that Professor McFadden's model was capable of showing anticompetitive

2    impact across all class members, the Court again stated that plaintiffs have "represented to the

3    Court that, once Apple produced the rest of its app transactional data, Professor McFadden will be

4    able to calculate the exact extent of injury suffered by each class member." (*Id.* at 26.) The Court

5    voiced its concern about the number of uninjured class members, and signaled that "it expects,

6    given plaintiffs' representations, that once the model is fully run, that number [of uninjured class

7    members] will be reduced or the cutoff could be changed to reduce the impact of including

8    unharmed accounts." (*Id.*)

9                    **3.    POST-CERTIFICATION EXPERT DISCOVERY**[5]

10    After the Court certified the class, consumer plaintiffs set out to calculate class damages by

11    payor, not Apple ID. That exercise required consumer plaintiffs to match over a billion payor

12    records (████ billion) to individual consumers. The number of payor records is several times

13    greater than the number of consumers. (Stodden Rebuttal Report, ("Stodden Reb. Rep."), Ex. 29,

14    Dkt. No. 1003-30, ¶ 12; Thompson Supplemental Report ("Thompson Supp. Rep."), Ex. 35, Dkt.

15    No. 1003-36, ¶ 8.) A single payor may be associated with several payor records because a new

16    record is created each time the payor creates a new Apple ID account or changes their name,

17    address, or payment method. (Stodden Reb. Rep. ¶ 21.)

18    Consumer plaintiffs engaged Darryl Thompson, the Chief Information Officer of JND

19    Legal Administration, to deduplicate and match Apple's payor records to consumers. That process

20    first required Thompson to "clean" Apple's user-generated payor data, which entails "the

21    detection and removal of errors and inconsistencies from data with the aim of improving data

22    quality." (Stodden Reb. Rep. ¶ 109.) Once the data was cleaned, Thompson was then required to

23    "match" Apple ID accounts to payors (i.e. class members) and validate those results. Thompson

24    used JND Legal's "well-accepted" and "proprietary" methods to deduplicate Apple's payor

25

26

27    ───────────────
[5] The Court finds that most of the parties' filed documents were not appropriately sealed and denies those requests by unsealing here. Any forthcoming omnibus motion to seal should be consistent with the content of this Order.

28

1   records. He reduced the number from ███ billion records to upwards of 200 million (███

2   million[6]) unique payors. (Song Report ("Song Rep."), Ex. 34, Dkt. No. 1003-35, ¶¶ 70, 74.)

3        Apple then engaged its own expert, Victoria Stodden, Ph.D., an Associate Professor of

4   Industrial and Systems Engineering at the University of Southern California, to examine

5   Thompson's work. Professor Stodden found that she could not replicate Thompson's work and

6   instead identified several alarming errors. For example, Thompson failed to match all payment

7   records belonging to the named plaintiff, Mr. Pepper, and determined that "Rob Pepper" and

8   "Robert Pepper" were different people, despite that the data listed the same home address and

9   credit card information for each. (Stodden Reb. Rep. ¶ 64.) Among other errors, Thompson

10  lumped together all payment records for individuals that shared the first name Kim, despite that

11  those over 40,000 records have nothing else in common, including different last names and

12  addresses. (*Id.* ¶ 66.) He did not omit, or otherwise address, records that inappropriately listed

13  Apple's Headquarters or "N/A" as the payor address. (*Id.* ¶¶ 57–58.) Nor did Thompson's

14  "propriety method" recognize that Bronx/Manhattan (which was cleaned to "BronxManhattan")

15  matched with some iteration of New York City. (*Id.* ¶ 100.) Professor Stodden further suspects

16  that Thompson did not systematically validate his output. By way of example, Professor Stodden

17  points to an instance where Thompson identified 1.9 million "unique payors" in King Salmon,

18  Alaska—a town of 375 residents. (*Id.* ¶ 101.)

19       Thomspon conceded at his deposition that his work contained several errors. Crucially, he

20  admitted that he did not, and could not, provide an error rate or confidence interval to validate his

21  work. (Deposition Transcript of Darryl Thompson ("Thompson Dep. Tr."), Ex. 16, Dkt. No. 1003-

22  17, 99:16–22.)

23       Thompson's matching analysis was ultimately incorporated into consumer plaintiffs'

24  damages model, namely that of Professor McFadden and Dr. Minjae Song (the McFadden-Song

25

26

27       [6] Thompson's initial declaration included a "typographical" error that stated that the
    number of unique payors was ███ million. (Dkt. No. 1029, Oppo. at 1, n. 1.) Thompson repeats
28  that error in his declaration in support of consumer plaintiffs' opposition to the *Daubert* motion.
    (Dkt. No. 1029-1.)

United States District Court
Northern District of California

1    model). The McFadden-Song model relies on Thompson's matched dataset to calculate damages

2    for each individual payor. (Song Rep. ¶¶ 70–74, Ex. 1.)

3                                              *    *    *

4         Apple, having observed these and other errors in plaintiffs' damages model, moved to

5    strike as unreliable Thompson's expert testimony and to decertify the class, arguing that consumer

6    plaintiffs did not, and could not, fulfill their representation to the Court and obligations under Rule

7    23.

8    **II.    *DAUBERT* MOTION**

9         **A.    LEGAL FRAMEWORK**

10        Federal Rule of Evidence 702 permits an expert's opinion testimony if the witness is

11   qualified and based upon that qualification, the witness's opinion is relevant and reliable.

12   Reliability turns on "the soundness of [the expert's] methodology." *Daubert v. Merrell Dow*

13   *Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1048

14   (9th Cir. 2025) ("[T]he reliability test may be applied to an expert's reasoning process.") An

15   expert witness may be qualified by "knowledge, skill, experience, training, or education" as to the

16   subject matter of the opinion. Fed. R. Evid. 702. The proponent of expert testimony has the burden

17   of proving admissibility in accordance with Rule 702. *Id.*, Advisory Committee Notes (2000

18   amendments). At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis

19   which scrutinizes the reliability of the expert testimony in light of the criteria for class certification

20   and the current state of the evidence." *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D.

21   245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir.

22   2020). For scientific opinions, they must be based on scientifically valid principles. *Daubert*, 509

23   U.S. at 589. Experts assist the fact finder in their own evaluation of the evidence by providing

24   them with opinions based upon verifiable, scientific, or other objective analysis. *Id.* at 589–90.

25        **B.    *DAUBERT* CHALLENGE TO DARRYL THOMPSON'S OPINIONS**

26        Apple moves to exclude the opinions of Darryl Thompson in their entirety, arguing that (i)

27   Thompson is not qualified to clean and match Apple's payor data for purposes of the damages

28   model, (ii) his methods and application of those methods are unreliable, and (iii) his analysis is

                                                    7

irrelevant because it misunderstood the key term "payor" as "account holder." (Dkt. No. 1001.)[7] The Court analyzes each argument in turn.

### 1.   QUALIFICATIONS

Apple first argues that Thompson's opinions should be excluded because he is not qualified to offer an expert opinion on data cleaning and matching as a non-statistician. In this context, the Court agrees.

Rule 702 requires that the Court determine that an expert witness "is qualified by special knowledge as an expert *in the relevant area of expertise*." *AFMS LLC v. United Parcel Serv. Co.*, 2014 WL 12515335, *6 (C.D. Cal. Feb. 5, 2014) (emphasis supplied). An expert's opinion will be excluded if it does not have a "reliable foundation" or if it is not based "in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 149 (1999) (quoting *Daubert*, 509 U.S. at 592).

As noted above, Thompson is the Chief Information Officer at JND Legal Administration, where he has worked for the last 27 years. (Thompson Supp. Rep., Appendix A.) He holds a Bachelor of Arts in Management Information Systems from Washington State University. (*Id*.) Thompson is not a statistician and does not have a degree or training in statistics. (Thompson Dep. Tr. 23:19–24:9; 58:12–14.) At JND Legal, Thompson "oversees the entire IT organization," which includes "infrastructure, networking, and data administration." (*Id*. at 24:19–25:5.) During claims administration for class action lawsuits, Thompson supervises class notice and distribution, and for "complex cases" is "involved in the data management and processing and prep and deduplication of data." (*Id.* at 25:6–24.) Thompson conceded at his deposition that notice and claims administration is different from matching data to identify injured persons because in the notice process, "[i]f you are able to deduplicate with high confidence but don't deduplicate the records that you do not have high confidence in the deduplication, you may slightly over-notice, but you are still notifying the class in the most efficient way possible." (*Id.* at 61:10–18.)

---

[7] In the same motion, Apple also moves to exclude the expert opinions of Professor Alan MacCormack to the extent that his opinions relate to the average profit margin earned by app developers on the App Store. The Court will not rule on that motion in this Order.

1    The issue here, Apple argues, is that consumer plaintiffs were not tasked with identifying

2 members to administer a settlement. Consumer plaintiffs were to match Apple ID accounts

3 identified in payor records to *actual consumers* in order to run the damages model. (Dkt. No. 789

4 at 1.) That is a different inquiry, and for that exercise, Apple argues that Thompson is unqualified.

5 Thompson concedes that he has never served as a testifying expert in a prior case. (Thompson

6 Dep. Tr. 10:5–7.) Moreover, at the October 14, 2025 hearing, counsel for consumer plaintiffs

7 confirmed that Thompson had *never* previously performed this exercise, or a similar matching

8 exercise. (Dkt. No. 1062, Oct. 14, 2025 Tr. 34:6–24.)

9    Apple argues that a qualified statistician or data scientist should have performed this

10 exercise. According to Apple's expert, Professor Stodden:

> The topics of data cleaning and deduplication have long been active
> areas of research in statistics and data science. Scientists frequently
> develop methods to clean (including data verification and validation)
> and deduplicate user entered addresses and other identifying
> information in application areas. . . . Statistical methods . . . are
> routinely used today in address matching, and many such models have
> been in frequent continuous use for many years. Statistical methods
> are also important to assess the reliability of data cleaning and
> deduplication, including through quantification of the error rates
> associated with data cleaning, deduplication, and estimation of unique
> payors.

18 (Stodden Reb. Rep. ¶ 29.) Professor Stodden details the extensive history and literature in this

19 discipline. (*Id.* ¶ 117.) For data matching, while there is "no single approach from the published

20 literature that works in all cases, there are certain best practices from the literature, which Mr.

21 Thompson did not utilize, such as allowing matches for records for which it is sufficiently clear

22 that they represent the same information and yet are not verbatim matches." (*Id.*) As to data

23 cleaning, Professor Stodden explains that "[t]here is extensive academic literature on the

24 importance of identifying and eliminating data errors to maximize the accuracy and reliability of

25 results" through proper data cleaning. (*Id.* ¶ 110.) At his deposition, Thompson conceded that he

26 was not aware of, and his methodology was not rooted in, literature or studies relating to data

27 matching. (Thompson Dep. Tr. 109:9–110:24.)

28    Nor was Thompson familiar with rudimentary statistical concepts. He admitted that he was

9

United States District Court
Northern District of California

1  unfamiliar with common distance metrics, like Levenshtein or Hamming distance, which are used

2  to help determine whether names or addresses match. (*Id.* at 114:6–19.) He did not know how to

3  measure an error rate or attempt to quantify it at all. (*Id.* at 99:16–22.) ("Q: How likely do you

4  think it is that you eliminated 100 percent of the duplication? A: I – I don't know how to quantify

5  – quantify that. I – I yeah, I don't know how to quantify that. Q: Okay. Have you tried to quantify

6  it at all? A: I have not.")

7       Consumer plaintiffs respond that Thompson's experience as a data specialist at JND Legal

8  qualifies him as in expert in data deduplication. They continue that Thompson has worked on data

9  deduplication and claims administration for several large, high-profile antitrust and data breach

10 settlements, and that he has prior experience deduplicating Apple's data. Consumer plaintiffs posit

11 that experience is worth more than any credential. According to consumer plaintiffs, there are "no

12 meaningful differences between the data deduplication work that Mr. Thompson and an academic

13 statistician perform" because he "carefully limits false positives and false negatives" and

14 perfection is not expected. (Oppo. at 11.)[8]

15      That argument is fundamentally misguided. Although the Court agrees that perfection is

16 not expected, the parties have not settled the case, and the litigation is not proceeding through a

17 settlement phase where Thompson's experience would be relevant. There, when deduplicating

18 payor records for purposes of providing class notice or administering a settlement, "overnotice"

19 may be appropriate. Here, the inquiry is different.

20      Consumer plaintiffs were to engage an expert to assist with their damages model. The

21 deduplicated data was intended to serve as an input to an econometric model that would determine

22 whether class members have antitrust standing. An accurate and reliable measure is necessary

23 because antitrust injury is an element of plaintiffs' claims. Not only has Thompson never

24 performed such work, but despite his work experience, he was not familiar with basic statistical

25

26      _____

27      [8] Consumer plaintiffs' argument that "the deduplication process was done to fulfill the
    Court's request for Plaintiffs to identify actual consumers with and without damages, the full
    implementation of which will only become necessary after trial during Class administration" is not
28  accurate. (*Id.*) As the Court has explained in its prior order, matching records to consumers is
    necessary to prove antitrust injury—an element of consumer plaintiffs' antitrust claim.

1    methods and could not provide an error rate or some other mechanism to validate his work.

2         Consumer plaintiffs' cited cases allowing an expert to testify based on the expert's

3    professional experience do not persuade. In those cases, experts were qualified to testify about

4    their workplace experience or industry norms. *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266 (9th

5    Cir. 1994) (longshoreman qualified to testify as an expert about deck conditions); *Hangarter v.*

6    *Provident Life & Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004) (insurance industry norms); *In re*

7    *PFA Ins. Mkt'g Litig.*, 2022 WL 3146557, at *2 (N.D. Cal. June 15, 2022) (practices and norms of

8    the life insurance industry). Thompson does not offer that sort of testimony here.

9         Accordingly, the Court finds that Thompson is not qualified to serve as an expert in

10   identifying payors for purposes of consumer plaintiffs' damages model.

11              **2.    RELIABLE METHODOLOGY**

12        For its second ground for exclusion, Apple argues that Thompson's opinions should be

13   excluded because Thompson's methodology is unreliable under *Daubert*. Again, the Court agrees.

14        Evidentiary reliability is "based upon scientific validity." *Daubert,* 509 U.S. at 590 n. 9.

15   "The question of reliability probes whether the reasoning or methodology underlying the

16   testimony" is valid. *Murray v. S. Route Mar. SA,* 870 F.3d 915, 922 (9th Cir. 2017). The Court is

17   concerned "not [with] the correctness of the expert's conclusions but the soundness of [their]

18   methodology." *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir.2010). The reliability inquiry is "a

19   flexible one." *Kumho Tire,* 526 U.S. at 150. Here, the Court may analyze "1) whether a theory or

20   technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the

21   known or potential error rate of the theory or technique; and 4) whether the theory or technique

22   enjoys general acceptance within the relevant scientific community." *United States v. Hankey,* 203

23   F.3d 1160, 1167 (9th Cir. 2000).

24              **a.   First Factor: Testability**

25        Apple argues that Thompson's methodology is a "black box" that cannot be tested or

26   replicated, in part because Thompson failed to document many steps in his methodology.

27        "To demonstrate testability under *Daubert*, an expert must provide sufficient explanation

28   for their methodology such that '[s]omeone else using the same data and methods [would] be able

United States District Court
Northern District of California

1   to replicate the result[s].'" *In re Incretin-Based Therapies Prods. Liab. Litig.*, 2022 WL 898595, at

2   \*1 (9th Cir. Mar. 28, 2022) (citing *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047

3   (9th Cir. 2014)). "Experts must follow some discernable methodology, [which] may not be 'a

4   black box into which data is fed at one end and from which an answer emerges at the other.'"

5   *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at \*4 (N.D. Cal. Apr. 16, 2014).

6         Thompson's methodology (in which he used code to clean and manipulate data) cannot be

7   tested or replicated. In his supplemental report, Thompson claims that he first cleaned Apple's

8   data using a proprietary "data cleansing algorithm" that he had developed. (Thompson Supp. Rep.

9   ¶ 17.b–c.) Next, Thompson deduplicated the payor data, which required him to write new code.

10   (*Id.* ¶ 17.d–f.) Thompson applied "multiple tiers" of a deduplication algorithm to identify possible

11   matches. (*Id.* ¶ 17.e.) "Each tier of the deduplication algorithm utilizes different available data

12   points in combination, or alone, to produce a match, and each match requires a different level of

13   review and validation based on the data points used in the match." (*Id.*) After Thompson evaluated

14   those results, he "wrote more code to apply additional matching logic" to records that were not

15   properly matched. (*Id.* ¶ 17.f) Thompson stopped the algorithm once he determined that "the

16   marginal returns were outweighed by the time and effort required to continue." (*Id.*) When the

17   deduplication process was complete, Thompson "cross-checked the address information against

18   publicly available data." (*Id.* ¶ 17.g.) Counsel for consumer plaintiffs produced Thompson's code

19   to Apple.

20         Upon review, Apple and its expert Professor Stodden determined that Thompson's code

21   was "not complete" and would not run without significant modifications. (Stodden Reb. Rep.

22   ¶ 128.) Thompson stated in a ReadMe file to Professor Stodden that he did not "save code" to

23   "create" rounds two and three of deduplication. (*Id.*) At his deposition, Thompson admitted that

24   his code was not in "deliverable" form and could not be run without modifications (i.e. turning on

25   or off undefined portions of the code), which were not recorded. (Thompson Dep. Tr. 127:2–12;

26   169:18–170:17; 173:12–15.) Nor did Thompson record, or could he otherwise explain, his

27   reasoning for selecting the data fields that he prioritized, each tier of the deduplication algorithm,

28   or the criteria for when Thompson would stop running the algorithm based on "marginal returns."

(*Id.* at 176:16–177:7; 103:17–104:13.) Further, Thompson outsourced certain of his work to a third party—Melissa Data Solutions—but could not explain or describe what that third party did. (*Id.* at 187:13–188:5.) [9]

Professor Stodden, unsurprisingly, could not replicate Thompson's work. (Stodden Reb. Rep. ¶¶ 128–29.) At his deposition, Thompson testified that counsel produced the code "substantially in the form [he] ran it with" which "should produce similar outcomes," yet Thompson could not rule out "that there would be some – some level of a discrepancy." (Thompson Dep. Tr. 174:2–24.)

Consumer plaintiffs respond that Thompson produced his code, and that running the code, and turning on or off certain portions, "should be relatively obvious to an individual experienced in – in SQL code." (*Id.* 172:18–173:11.) They did not address Apple's argument that certain rounds of code were not documented or saved. Consumer plaintiffs further claim that any "reasoned judgment" Thompson made rests on "decades of data deduplication experience," and they argue that any concerns related to Professor Stodden's different result is "fodder for cross examination." (Oppo. at 20.)

Consumer plaintiffs miss the point. The Court finds that Thompson's work is not testable, and that this factor weighs in favor of exclusion. Thompson failed to record, or explain, his entire methodology such that it could be replicated. That includes the role of Melissa Data Solutions, which remains a "black box" to Apple and this Court. *GPNE Corp.*, 2014 WL 1494247, at *4. Although the Court agrees that an expert may make reasoned judgment calls based on their expertise, that expert must document and record those judgment calls so that they may be tested and analyzed. *Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) ("Rather than spelling out the steps she took to go from the data to the royalty rate opinion, Holt cites her 'experience'—an abstraction not visible to the eyes of the Court, the jury, and opposing

---

[9] Melissa Data Solution's policies prevented Professor Stodden from accessing the tool. (Stodden Reb. Rep. ¶ 131) ("I was also unable to perform any analyses regarding the Melissa Data Solutions NCOA product used by Mr. Thompson, except using the data he provided, since my analytical use case did not meet the requirements for access under the Melissa Data Solutions policies.")

counsel, or testable in the crucible of cross-examination.") Such documentation is particularly important, where, as here, consumer plaintiffs seek damages exceeding $20 billion. Thompson did not do so.

### b. Second and Fourth Factors: Peer Review & Acceptance in the Scientific Community

Apple argues that Thompson's method was not peer reviewed, nor did he rely on any method that has been peer reviewed, and his method is not generally accepted in the scientific community. Professor Stodden found that Thompson's methodology went against scientific consensus in requiring "exact string matches in order to group records," because "many scientific publications have found that exact string matching algorithms are significantly less reliable than alternative statistical methods because they can be too restrictive." (Stodden Reb. Rep. ¶¶ 119–120.)

Consumer plaintiffs do not dispute Apple's points, notwithstanding Thompson's report indicating that he uses "well accepted" methods (without describing them). Instead, they respond that those factors are irrelevant because plaintiffs offer Thompson as an expert based on his experience as a claims administrator, and Thompson used competitively sensitive methods to deduplicate that cannot be peer reviewed.

Consumer plaintiffs' arguments do not persuade given that the Court has already found that Thompson's experience is not relevant to this inquiry. Both factors also weigh in favor of excluding Thompson's testimony.

### c. Third Factor: Error Rate

Apple argues that Thompson's testimony should be excluded because he does not provide, and cannot calculate, an error rate or confidence interval for his deduplication work.

Professor Stodden explains that:

> In data analytics and statistics, validation is an essential step to ensure that a method is reliable. In the context of Mr. Thompson's data cleaning, validation should be applied to the data, to ensure data cleaning actually brings the cleaned values closer to the correct values, and to the output itself, to ensure the statistical estimates are close to what they should be. As it relates to his deduplication effort, validation would allow the estimation of the magnitude of errors in his method that could either lead to incorrectly grouping records that

14

should not have been grouped, and therefore underestimating the number of unique payors, or fail to group records that should be grouped, resulting in overestimation of the number of unique payors. Error estimation is crucial for assessing the reliability of Mr. Thompson's methods.

. . .

In scientific work, typically a confidence interval is calculated, which allows a scientist to quantify the expected accuracy of the estimated output. Thus, I would expect Mr. Thompson's estimate of unique payors to be accompanied by a measure of error such as a confidence interval, so a reader can assess the accuracy of his estimate of the true number of unique payors.

(Stodden Reb. Rep. ¶¶ 93, 95.) Thompson admitted that he did not measure an error rate and did not know how to do so. (Thompson Dep. Tr. 99:16–22; 114:6–19.) When asked about the sources of the mistakes that Thompson was able to identify, Thompson responded "I don't know how to answer that because I – I looked for mistakes. I tried to identify mistakes and then fix mistakes. So if I had a – a area where I thought, oh, there's mistakes, I would have attempted to fix and resolve." (*Id.* at 165:15–166:2.)

Consumer plaintiffs argue that "Mr. Thompson's methods remain reliable notwithstanding the absence of an error rate" because "an overall error rate cannot be determined in a meaningful way." (Oppo. at 22.) Consumer plaintiffs then deflect by attempting to shift the burden to Professor Stodden to calculate Thompson's error rate which she did not do.[10] It is not Apple's burden.

Here, the Court finds that Thompson's failure to provide an error rate, confidence interval, or otherwise meaningfully validate his work weighs in favor of excluding his testimony. Because Thompson's method was not analytical, he could not identify the sources of his mistakes. Although consumer plaintiffs argue that calculating an error rate is not possible, Professor Stodden has offered several ways in which Thompson may have done so. (Stodden Reb. Rep. ¶ 96.) That Thompson chose not to, combined with Thompson other unreliable decisions, further suggests that his testimony should be excluded.

---

[10] Professor Stodden did not attempt to estimate the error rate but anticipated that she would find a "high error rate given the numerous problems" identified. (*Id.* ¶ 97.)

1   Based on the four factors analyzed, Thompson's opinions should be excluded.

2   ### 3.   RELIABLE APPLICATION OF THE METHODOLOGY

3   For its third ground for exclusion, Apple argues that Thompson did not reliably apply his

4   methodology. Apple claims that Thompson's deduplication work was replete with errors in terms

5   of both cleaning and deduplicating Apple's payor data. Consumer plaintiffs disagree. The Court

6   considers both.

7   ### a.   Data Cleaning

8   Data cleaning is "the detection and removal of errors and inconsistencies from data with

9   the aim of improving data quality." (Stodden Reb. Rep. ¶ 109.) In effect, it means to audit or to

10   correct the data. Here, and from the outset, Apple cautioned that its payor data was "user

11   generated" and regularly contained inadvertent or intentional user error.[11]

12   Apple argues that rather than "clean" the data, Thompson's "cleaning" merely eliminates

13   key characters.[12] For example, many payor records, for unknown reasons, list Apple's former

14   corporate headquarters as the home address. Although Thompson testified that it would be

15   appropriate to remove that address from the dataset, he instead "cleaned" the data by removing the

16   address's spaces. Without explaining his logic, "Apple Computer Inc. 1 Infinite Loop" became

17   "AppleComputerInc1InfiniteLoop." (Stodden Reb. Rep. ¶ 58, Ex. 6.; Thompson Dep. Tr. at

18   89:20–90:17) ("No. In my opinion, that – Apple's address as an Apple payor address is not a valid

19   address.") Thompson removed backslashes from fractional addresses and abbreviations. Thus,

20

21   ───────────────

22   [11] Thompson encountered many data quality issues. (Stodden Reb. Rep. ¶ 25, n. 3) (citing Thompson Decl. ¶ 5 ("A large portion of the records had missing data, values of '[Missing in DS]', 'NA' and 'X'. Nearly 10% of records provided have these data issue. Records also

23   contained non-standard ASCII values ranging from foreign language characters to emojis. Fields contained unexpected data. For example, the state field contained over 1600 unique values. This is

24   because information, such as California, for instance would be represented as 'CA' or 'California.' In addition, some data was in the wrong fields – for example, some of the 1600 states

25   were cities. Also, some portion of the data seemed to have values shifted to the wrong fields (name in the phone field as an example).")

26   [12] In large and complex datasets, "where it is impossible to manually review all the observations, researchers typically follow a systematic approach of auditing data to identify the

27   types of anomalies reducing the data quality, . . . choosing appropriate methods to automatically

28   detect and remove them." (Stodden Reb. Rep. ¶ 111.)

"N/A" became "NA" and "1/2" became "12." (Stodden Reb. Rep. ¶¶ 57–59.) Nor did Thompson consistently clean or format the apartment number field—"#2" became "2" and "Apt. 2" became "Apt2," but 2 would not match with Apt2. (*Id.* ¶ 60.) Where individuals entered their email address rather than their physical address, Thompson omitted the "@" symbol and continued to use the data to match based on that invalid address. (*Id.* ¶ 59.) Those exemplars, according to Professor Stodden, accounted for hundreds of thousands of payor records. (*Id.* ¶ 58, Ex. 6.) Professor Stodden explains that these "outliers" should have been studied, corrected, or removed from the data set. (*Id.* ¶ 115.)

In response, consumer plaintiffs argue that none of the errors that Apple identified would have been match dispositive, meaning that for records to match and "roll up," those records must have also matched based on some other trustworthy piece of data. Those "no harm, no foul" arguments do not persuade. One, they still ignore that the Court must assess the reliability of the approach. Two, they ignore the responsibility to take some legitimate approach with the data, which includes preparing the data such that it is not over or under matched. There may be records that *should* have been matched and were not. Three, consumer plaintiffs do not explain what the other "trustworthy" pieces of data are such that the Court can evaluate the reliability of Thompson's work. Four, in effect, Thompson admits that he kept unreliable, and invalid, information in the dataset by maintaining Apple's address in the data set while acknowledging that it is not a valid payor address. [13]

Based on the factors analyzed, the Court finds that Thompson did not use a reliable method to clean Apple's payor data such that it could reliably be used in the model.

### b. Data Deduplication

In terms of deduplicating the data, Thompson claims that he was able to deduplicate ██ billion payor records to identify over two hundred "██ [sic] million unique individuals." (Thompson Supp. Rep. ¶ 18.) Apple challenges his process on at least three grounds.

---

[13] Consumer plaintiffs contend that valid reasons may explain why people entered Apple's corporate address. For instance, consumer plaintiffs hypothesize that some of those individuals may have been Apple employees. That argument does not address the problem.

17

*First*, Apple argues that Thompson's methodology required verbatim matching for certain data fields, like name, and that requirement led to absurd results. (Stodden Reb. Rep. ¶ 119.) For example, Thompson failed to properly match records for *named plaintiff* Robert Pepper because his name(s) included in the records—"Rob Pepper" and "Robert Pepper"—were not an exact match despite that Pepper's address, phone number, and credit card number otherwise matched across records. (*Id.*) Here, according to Professor Stodden, "[i]n the academic literature, two records are considered equivalent if they are equal semantically, meaning the two records convey equivalent information. Therefore, two records do not need to be exactly identical to be considered a match." (*Id.* ¶ 120; cleaned up.) At his deposition, Thompson admitted the underlying error. He conceded that the first names "Deb" and "Debra" are likely the same individual when the address (but for a period) and last name matched. (Thompson Dep. Tr. 154:11–155:13.)

*Second*, Apple argues that Thompson's analysis overmatches in other respects. By way of example, Apple points to the "Kim" error, where Thompson matched over 40,000 individuals that share the first name Kim, "some of which have little or no information in common other than the first name." (Stodden Reb. Rep. ¶ 66.) Exhibit 9 to Professor Stodden's report shows three exemplar "Kims" that were incorrectly matched, each listing different last names, credit card numbers, phone numbers, and addresses. (*Id.*) When Professor Stodden ran her best recreation of Thompson's code in attempt to replicate his work, she identified 2,908 unique payors instead of one unique payor. (*Id.*) At his deposition, Thompson again conceded that "as a general statement, I agree that matching on first name alone is not a – a valid match criteria." (Thompson Dep. Tr. at 152:5–7.) Based on those examples, Professor Stodden concluded that "Mr. Thompson's method has serious errors that cause his method to both overestimate and underestimate the number of distinct payors." (Stodden Reb. Rep. ¶ 67.) Taken together, Apple's exemplars suggest that Thompson's errors are more than an aberration.

*Third*, Apple argues that Thompson does not appear to have validated or cross-checked his results.[14] As an example, Apple points to an instance where Thompson identified 1.9 million

---

[14] Although not argued in the parties' briefing, Thompson also appears to have failed to remove obviously fake phone numbers from the dataset, including numbers like "1234567"

18

"unique payors" located in King Salmon, Alaska, a town of 375 residents. (*Id.* ¶ 101.) For context, that would mean that King Salmon, Alaska has more than twice the number of residents as San Francisco, California. Apple argues that Thompson's failure to catch that clear error suggests that he did not reliably validate his work product. Professor Stodden explains that this too is not an aberration. There "are purportedly unique payors in Mr. Thompson's matched results that are associated with hundreds or thousands of records" and other locations "with an implausible number of payors." (*Id.*)

In response to those three arguments, consumer plaintiffs explain that Thompson's "code did include logic that allowed matching on 'a partial first name'—the first three initials [sic] of the first name, last name, address, and Apple ID." (Oppo. at 25) (Thompson Dep. Tr. 155:19–25) ("So the – the al – matching algorithm does do partial first name along with last name and address. But I believe because partial first name does, you know, present a – a increased risk of overmatching, I believe the algorithm includes a – the phone number hashed as a – as a validator to compensate for the increased risk of partial name.") That argument raises more questions than answers. If the algorithm supposedly allowed partial matches, why did Thompson's algorithm not match payor records for named plaintiff Pepper? Or with Deb as opposed to Debrah? At the hearing, counsel attempted to argue that Thompson's failure to match Pepper's records was not an "error" because, depending on "cultural context," it may not be obvious that "Rob" is a nickname for "Robert." Maybe so, but Stodden identified routine methods that address those kinds of issues. (Stodden Reb. Rep. ¶¶ 120– 121.)[15]

Consumer plaintiffs' response explains little. They argue that Thompson reliably applied his methodology, but "the data compelled different results" pointing to the King Salmon, Alaksa example and suspected fraud. Or, in response to the "Kim" error, they remarkably blame Apple for

---

despite that Apple provided Thompson with a list of 16 fake numbers, the vast majority of which Thompson did not remove. (Stodden Reb. Rep. ¶ 99.)

[15] Partial name matching that is based on only the first three letters of a full name and nickname would not address many potential scenarios, including a William that goes by Bill, (Stodden Reb. Rep. ¶ 64, n. 78) or an individual that goes by their middle name rather than their first name.

United States District Court
Northern District of California

1    failing to "clean up bad consumer-entered data"[16] and assert that the users had all entered the same

2    phone number and address. (Thompson Decl. ¶ 37.) That latter explanation, however, is

3    inconsistent with Exhibit 9 of Professor Stodden's report, which details several "Kim" entries

4    associated with different phone numbers and addresses. (Stodden Reb. Rep. ¶ 66, Ex. 9.)

5         In short, the Court is left without a consistent or cohesive explanation of how the exemplar

6    errors occurred. For the "Kim" error—which plaintiffs concede was an error—consumer plaintiffs

7    suggest that the error is insignificant to the overall analysis. (Thompson Decl. ¶¶ 37–38.) The

8    Court would agree if it had any assurance that Apple's exemplars defined the universe of

9    Thompson's errors. Without an error rate, however, the Court cannot tell, and the burden lies with

10   the consumer plaintiffs. Moreover, in the face of obvious error, Thompson did not correct,

11   systematically analyze, or eliminate the data.[17]

12        Given those errors, the Court agrees with Apple that Thompson did not reliably apply his

13   methodology.

14        **4.    DEFINITION OF PAYOR**

15        Apple's fourth and final ground urges exclusion because Thompson sought to match

16   "names" rather than "payors" and only "payors" are relevant to this action. To be a member of the

17   class in this litigation, a member must have directly purchased an app or in app content from

18   Apple. *Apple Inc. v. Pepper*, 587 U.S. 273, 281 (2019) ("The iPhone owners purchase apps

19   directly from the retailer Apple, who is the alleged antitrust violator. The iPhone owners pay the

20   alleged overcharge directly to Apple. The absence of an intermediary is dispositive.") Expert

21   testimony, of course, must be "relevant to the task at hand." *Daubert*, 509 U.S. at 597.

22        Here, Thompson equated payors with the names listed in payor records. Apple asserts that

23

24        [16] Thompson reviewed a sample of Apple's payor data and determined that he could

25   reliably and accurately deduplicate it. (Thompson Supp. Rep. ¶¶ 9–11.)

26        [17] Consumer plaintiffs also respond that the Court need not be concerned with Apple's
     exemplars because Dr. Song's supplemental report, based on Apple ID accounts, somehow

27   validates Thompson's work. The Court struck Dr. Song's supplemental report—which consumer
     plaintiffs did not dispute—as untimely and unnecessary at the October 14, 2025 hearing. (Dkt. No.

28   1062, Oct. 14 Tr. 28:22–30:10.)

United States District Court
Northern District of California

payors must be identified through analyzing credit card or other payment information. To illustrate

its point, Apple cites a common example: families. Children often use their parent's credit card to

purchase apps or make in-app purchases in Apple's App Store through their own Apple ID. Here,

although the parent paid Apple for the transaction, and was therefore the direct purchaser,

Thompson's analysis viewed the child—who did not directly pay Apple—as a payor. (Thompson

Dep. Tr. 160:18–24) (Q: What is your definition of "payor"? A: A – a individual that paid for

something. And I'm not aware of anything that suggests that it has to be their own credit card, just

that they have to make a payment. And, therefore, they have a transact – a record in the transaction

data with their personal information on it.") In other words, Thompson identified two payors

rather than matching those records to one payor. That error pervades Thompson's analysis.

Professor Stodden identifies that, of Apple users who paid with credit or debit cards, 22.3% used a

card that has also been attributed to another payor. (Stodden Reb. Rep. ¶ 53.)

Consumer plaintiffs disagree with that analysis, citing the class definition and Supreme

Court precedent. They assert that "[i]f an iPhone owner clicked 'purchase' on an app, they are the

direct purchaser" and argue in conclusory fashion that the indirect-purchaser rule is not concerned

with "analyzing *whose* money the direct purchaser spent." (Oppo. at 13.)

On this argument, the Court disagrees. As the Supreme Court stated in its prior decision in

this case: "If the iPhone owners prevail, they will be entitled to the *full amount* of the unlawful

overcharge that *they paid* to Apple." *Apple*, 587 U.S. at 287 (emphasis supplied). To the extent

consumer plaintiffs argue that children were "purchasers" because they directed the payment,

those children likely would not have Article III or antitrust standing to advance their claim

because they do not have a concrete economic injury. *See Y.H. v. Blizzard Ent., Inc.*, 2024 WL

5431490, at *5 (C.D. Cal. Aug. 14, 2024) ("Plaintiff purchased the cards with her father's credit

cards on her father's account. . . . Thus, any claimed economic damage resulting from the cards

was her father's, not her own.").[18]

---

[18] *See also*, (Dec. 8, 2014 Transcript of *Apple iPod iTunes Anti-Trust Litigation*, No. 05-000037-YGR at 1303) (finding that the named direct-purchaser plaintiff did not have standing because plaintiff did not purchase the iPod with her own money, rather her husband's law firm did).

21

On the other hand, the record is mixed with respect to identifying payors via payment method. At the October 14, 2025 hearing, the parties discussed whether Thompson could have, or should have, deduplicated the payor data by payment method, for example by credit card or PayPal account. Consumer plaintiffs requested payment information, including "the full card number," from Apple. (Dkt. No. 1061-2, Ex. B.) In response, Apple provided consumer plaintiffs with hashed, complete payment information, but represented via email and in an accompanying data dictionary that the data field included only the last four digits of the payment method. (Dkt. Nos. 1061-2, Ex. B; 1035-14.) Consumer plaintiffs did not move to compel that information (Dkt. No. 1061-2), nor did they inquire about whether the hashed data field (containing letters and 16 numbers) represented anything other than the last four digits of the payment method. (*Id.*) Thompson incorporated the last four digits of the credit card into his matching analysis but still could not sufficiently identify the payors.[19]

The Court agrees that Thompson's presented analysis is not relevant to this case because it does not identify payors.

*   *   *

In sum, the Court finds that Thompson's expert testimony should be excluded because he is not qualified, his methods are not reliable, he did not reliably apply his methods, and his testimony is not relevant to this action. The Court has no confidence in Thompson's work. For those reasons, the Court **GRANTS** Apple's *Daubert* motion as it relates to Darryl Thompson.

---

In light of the ultimate resolution, the Court need not opine on the notion of whether, in an individual case, children may have reimbursed their parents thus classifying the parent as the intermediary. Issues between parents and children can be resolved if the model connects the payor with a payment method.

[19] Apple should have accurately transmitted the information and affirmatively corrected consumer plaintiffs' understanding of the data that Apple produced. Consumer plaintiffs should have known or identified that they received complete information regarding payment method and confirmed that understanding with Apple, given how important that data is to this case. In the end, the failures on both sides do not compel a different result.

United States District Court
Northern District of California

United States District Court
Northern District of California

### III.    MOTION TO DECERTIFY

#### A.    LEGAL FRAMEWORK

"A district court may decertify a class at any time." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). "A motion for class decertification is subject to the same standard as a motion for class certification under Federal Rule of Civil Procedure 23." *Wood v. Marathon Ref. Logistics Servs. LLC*, 2024 WL 4868181, at *1 (N.D. Cal. Oct. 28, 2024) (citing *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942 (9th Cir. 2011)). Like with class certification, "the party seeking certification bears the burden of demonstrating that the requirements of Rule[ ] 23(a) and (b) are met." *Id.* Decertification should "only take place after some change, unforeseen at the time of the class certification, that makes alteration of the initial certification decision necessary." *In re Apple iPod iTunes Antitrust Litig.*, 2014 WL 6783763, at *5 (N.D. Cal. Nov. 25, 2014). Whether to decertify a class is ultimately within the discretion of the court. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).

#### B.    ANALYSIS

Apple moves to decertify the class under Rule 23(a) and (b)(3). Given the Court's prior orders, the crux of the dispute is whether consumer plaintiffs satisfy Rule 23(b)(3)'s predominance requirement as it relates to injury and damages.

##### 1.    PREDOMINANCE: LEGAL FRAMEWORK

As the Court has explained in its prior rulings, Rule 23(b)(3)'s predominance requirement is demanding. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). Under Rule 23(b)(3), a court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).

"When individualized questions relate to the injury status of class members, Rule

23

United States District Court
Northern District of California

23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668 (9th Cir. 2022) (en banc). That is particularly true in antitrust class actions, where plaintiffs must prove as "an essential element of the cause of action," that antitrust injury is "capable of being established through a common body of evidence, applicable to the whole class." *Id.* at 666. Where experts are involved, a court must decide if the expert's methodology is "capable of showing class-wide antitrust impact" in light of "factors that may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs)." *Id.* at 683.

The Ninth Circuit has clarified that a class may contain a "*de minimis* number of uninjured class members," so long as "the district court determine[s] after rigorous analysis whether the common question predominates over any individual questions, including individualized questions about injury or entitlement to damages." *Id.* at 669. Even then, "a court must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Id.* at 669, n. 14.

### 2.   PREDOMINANCE: ANALYSIS

Apple argues that consumer plaintiffs, through the McFadden-Song model, are not capable of establishing antitrust impact on a classwide basis. Consumer plaintiffs disagree.

The McFadden-Song model attempts to predict "the app and in-app content prices consumers would have paid absent Apple's alleged misconduct" through analyzing "the But-For commission rate, consumer demand, and developer costs." (Report of Daniel L. McFadden ("McFadden Rep."), Dkt. No. 1003-34, Ex. 33, ¶¶ 38–39.) The Court thoroughly examined this model in its prior class certification orders. (Dkt. Nos. 630, 789.) Consumer plaintiffs and their experts acknowledge that not all app developers respond in the same way to Apple's commission rate; some developers may choose to pass through some or all of Apple's charged commission to their consumers, while others may not. (McFadden Rep. ¶¶ 47–48.) One of the ways the McFadden-Song model attempts to address this issue is through constraining the model with "margin bounds" based on app genre. (*Id.*) Under the model, some consumers may be injured

24

1   while others may be better off, depending on what apps, or combination of apps, those consumers

2   purchased. (Song Rep. ¶¶ 79–80.)

3        Because of that differing injury status, it is crucial that the model accurately and reliably

4   match payor records to actual consumers to determine whether the consumer was injured, and if

5   so, to what extent. (Rebuttal Expert Report of Jeffrey T. Prince ("Prince Reb. Rep."), Dkt. No.

6   1003-99, Ex. 98, ¶ 49.) For example, as Apple's expert Dr. Jeffrey Prince explains, if "Payor A"

7   was harmed by $2 and "Payor B" was unharmed by $5, if those transactions "were actually

8   associated with a single payor, rather than two separate payors, the single payor would be

9   unharmed by $3." (*Id.*)

10        Without the Thompson report, which this Court excluded, the litigation is back to square

11   one. Consumer plaintiffs proffer no methodology to match Apple ID accounts to consumers, and

12   therefore no way to show that antitrust injury is "capable of being established through a common

13   body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666. That alone requires

14   decertification. The Court finds that consumer plaintiffs no longer satisfy the predominance

15   inquiry for three reasons, which overlap with the Court's prior *Daubert* analysis.

16        ***First***, as the Court has already explained, Thompson's matching exercise is unreliable,

17   untested, and contains obvious errors. *See* Section II.B.3.b, incorporated herein.

18        Consumer plaintiffs' efforts to downplay Thompson's errors or the importance of his work

19   do not persuade. They argue that the errors that Apple identified are overstated and can be

20   measured in the "thousandths of a percent." (Oppo. at 12.) That estimate assumes that Apple's

21   cited errors are *not* exemplars. Without an error rate or confidence interval, the Court is not

22   convinced.[20] Inasmuch as consumer plaintiffs contend that Dr. Song conducted his analysis

23   separate from Thompson's work, his report belies that conclusion. (*Compare* Oppo. at 9 *with* Song

24   Rep. ¶¶ 69–70.)

25

26

---

27       [20] Consumer plaintiffs also attempt to blame Thompson's errors on Apple's data keeping practices. They cannot do so, and Thompson himself claimed that he could deduplicate Apple's

28   payor data after he reviewed a sample of that data. (Thompson Supp. Rep. ¶ 15.)

United States District Court
Northern District of California

1   With respect to consumer plaintiffs' argument that they need not identify every class

2   member, and that Apple raises ascertainability (not predominance) arguments, the Court agrees

3   with the former, but not the latter. The Court previously certified a class expecting a small

4   percentage of unharmed *people* to be included in the final analysis.[21] That is not the issue. The

5   task was to employ a common and reliable methodology that was "capable of establishing antitrust

6   impact on a class-wide basis." *Olean*, 31 F.4th at 678. Here, if "individualized questions relate to

7   the injury status of class members, Rule 23(b)(3) requires that the court determine whether

8   individualized inquiries about such matters would predominate over common questions." *Id.* at

9   668; *see also Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136–39 (9th Cir. 2016) (addressing

10  claim that class definition was overbroad—and thus arguably contained some members who were

11  not injured—as a Rule 23(b)(3) predominance issue); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d

12  1121, 1124 n.4 (9th Cir. 2017). Consumer plaintiffs did not satisfy their burden. The Court's

13  predominance analysis is appropriate.

14      ***Second***, Thompson's work is ultimately not relevant because, rather than focusing on

15  matching payment records to the "person" who "paid" or the "payor," his methodology revolves

16  around names. It does not identify injured class members. *See S*ection II.B.4, incorporated herein.

17      ***Third***, as a last-ditch effort, consumer plaintiffs pivot and argue that all class members are

18  "harmed" by a lack of choice, which satisfies the "antitrust injury" requirement. Even if that were

19  true for all class members, which Apple disputes, consumer plaintiffs would still be required to

20  prove damages on a classwide basis. The Court previously rejected consumer plaintiffs' belated

21  request for injunctive relief because plaintiffs did not move for it. (Dkt. No. 981) ("Plaintiffs did

22  not move to certify an injunctive class, and the Court is unprepared to do so via class notice when

23  its prior orders addressing the issue contemplated only a damages class.") Consumer plaintiffs

24  must prove damages.

25

26

27  _____

28      [21] The Court disagrees with Apple's focus on the number of unharmed members rather
    than the percentage. Given Apple's size, that approach would almost inevitably shield Apple from
    ever being held accountable for potentially illegal conduct.

1    Accordingly, the Court finds that the consumer plaintiffs have failed to provide a model

2    capable of reliably showing classwide injury and damages in one stroke. Nor can it reliably limit

3    the percentage of uninjured class members, such that the Court may determine whether the class is

4    "fatally overbroad." *See Olean*, 31 F.4th 669, n. 14. The Court **GRANTS** Apple's motion to

5    decertify the class.

6    **IV.    IMPACT ON TRIAL**

7    On October 11, 2024, the Court approved the parties' request to modify the pretrial

8    schedule but advised the parties that they would be required to parallel process the pending

9    motions and trial motions to maintain the trial date. (Dkt. No. 933.) With trial deadlines looming,

10   the Court issued this order promptly to conserve the parties' resources. Consumer plaintiffs

11   indicated to the Court at the October 14, 2025 hearing that they (i) would elect not to proceed with

12   trial on the individual claims of Stephen Schwartz, Robert Pepper, and Edward Lawrence on

13   February 2, 2025, but (ii) will seek appeal of this decision under Rule 23(f) within fourteen (14)

14   days of this order. As the parties are required to begin trial preparations soon, the Court advises

15   that it is inclined to stay the action should an appeal be taken.[22] The parties shall file a joint status

16   report within fifteen (15) days of this order. Other pending motions will be addressed in due

17   course.

18   **V.    CONCLUSION**

19   For the foregoing reasons, Apple's motion to exclude the expert testimony of Darryl

20   Thompson and motion to decertify the class are **GRANTED.**

21   This Order terminates Docket Nos. 1001, 1005, 1059, 1064, 1066.

22   **IT IS SO ORDERED.**

23

24   Dated: October 27, 2025

25   _____
     **YVONNE GONZALEZ ROGERS**
     **UNITED STATES DISTRICT COURT JUDGE**

26

27   _____

28   [22] This Order should not be interpreted to take a position on whether the Court should stay the companion case *Lepesant et al. v. Apple, Inc.*, No. 4:21-cv-08819 (N.D. Cal.). The Court will await the parties' position statements on that topic.

27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No. 4:11-cv-6714-YGR

**ORDER**
**DENYING APPLE'S *DAUBERT* MOTION TO**
**EXCLUDE THE TESTIMONY OF PROFESSOR**
**DANIEL L. MCFADDEN AND DR. ROSA**
**ABRANTES-METZ; AND**

**GRANTING PLAINTIFFS' MOTION FOR CLASS**
**CERTIFICATION**

Re: Dkt. Nos. 683, 690, and 786

**IN RE APPLE IPHONE ANTITRUST
LITIGATION**

Pending before this Court is the Renewed Motion for Class Certification filed by plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter, and Edward Lawrence ("consumer plaintiffs"), a *Daubert*[1] motion to exclude the testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz filed by defendant Apple, Inc., and an Omnibus Motion to Seal which will be addressed by separate order. Though the Court previously denied in part plaintiffs' motion for class certification, it noted that it expected that plaintiffs could fix the identified problems with their expert's econometric model. At this juncture, plaintiffs have resolved those deficiencies. The Court, therefore, **GRANTS** the renewed motion for class certification and **DENIES** Apple's *Daubert* motion.

Given the procedural posture of this motion, the Court accepts plaintiffs' representation that Professor McFadden can: (i) match the Apple identification numbers he has with *actual consumers* to ascertain class members, and (ii) limit the percentage of unharmed class members swept in by the narrowed class definition. Should Professor McFadden's model fail to do both, the Court will consider whether modification or decertification is appropriate for all or part of the class. *See City of Los Angeles, Harbor Division v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (holding that a district court is free to "reconsider, *rescind*, or modify an

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993).

1   interlocutory order" such as certification of a class "for cause by it seen to be sufficient" (emphasis

2   supplied)).

3   **I.      BACKGROUND**

4          **A.      FACTUAL BACKGROUND**

5          The facts of this case are well known to the parties. The background relevant to the instant

6   motion is summarized as follows:

7          Consumer plaintiffs bring this class action pursuant to Section 2 of the Sherman Antitrust

8   Act of 1890, 15 U.S.C. § 2, on behalf of the following class:

9          All persons in the United States, exclusive of Apple and its employees, agents and
           affiliates, and the Court and its employees, who purchased one or more iOS
10         applications or application licenses from Defendant Apple Inc. ("Apple"), or who
           paid Apple for one or more in-app purchases, including, but not limited to, any
11         subscription purchase, for use on an iOS Device at any time since July 10, 2008
           (the "Class Period"). The Class is limited to those persons who paid more than
12         $10.00 in total to Apple during the Class Period for iOS application and in-app
           purchases from any one Apple ID account.
13

14  (Dkt. No. 666-1, Renewed Motion for Class Certification, "Mot." at 1.) Consumer plaintiffs

15  theorize that Apple charges developers on the App Store supracompetitive commissions, which

16  the developers then pass to consumers in the form of increased prices for app downloads or

17  subscriptions.  (Dkt. No. 228, Third Amended Complaint, ¶ 47.) Consumer plaintiffs allege that

18  this conduct allows Apple to unlawfully monopolize the retail market for the sale of apps,

19  including in-app purchases ("IAP").

20         Consumer plaintiffs bring two causes of action against Apple based on this alleged

21  conduct: (1) unlawful monopolization of the applications aftermarket in violation of Section 2 of

22  the Sherman Act and (2) attempted monopolization of the applications aftermarket.  (*Id*. ¶¶ 78–

23  88.)

24         **B.      PROCEDURAL BACKGROUND**

25                 **1.      PREVIOUS *DAUBERT* MOTION**

26         In its previous order, the Court granted in part and denied in part Apple's *Daubert* motion

27  to exclude Professor McFadden's expert opinion and denied without prejudice consumer

28  plaintiffs' motion for class certification. (Dkt. No. 630, "Previous Order.") With respect to the

                                                  2

United States District Court
Northern District of California

1  *Daubert* motion, Apple challenged several aspects of Professor McFadden's econometric model.

2  The Court examined these challenges systematically.

3  First, it denied Apple's motion as to Professor McFadden's overarching model. Apple

4  argued that Professor McFadden's econometric model was meant not to test whether Apple's

5  allegedly anticompetitive conduct had a common impact on class members but to prove it. (*Id.* at

6  3.) The Court disagreed, finding that Professor McFadden relied on sound scientific and economic

7  principles to determine that Apple's commission rate on developers acts as a tax for both

8  developers and their consumers. (*Id.* at 4.)

9  Next, the Court denied Apple's motion as to Professor McFadden's market definition. (*Id.*

10  at 5.) Professor McFadden opined that there was a single relevant aftermarket for selling iOS apps

11  and in-app content to consumers.  Apple argued that he had ignored the two-sidedness of the App

12  Store. (*Id.*) The Court found that, under *Daubert*, the bases of Professor McFadden's market

13  definition were sound. It declined to address the merits question of whether Professor McFadden's

14  market definition was correct because, traditionally, market definitions are highly factual, and

15  frequently the focus of any trial.

16  Finally, the Court ruled on Apple's challenges to Professor McFadden's three-step

17  approach to quantifying the impact and damages of Apple's allegedly anticompetitive conduct. In

18  step one, Professor McFadden identified the but-for commission rate—the commission rate that

19  would exist but for Apple's monopolistic practices. The Court rejected Professor McFadden's but-

20  for commission rate as arbitrary, finding that Professor McFadden was not an expert in the

21  relevant fields nor was his conclusion the product of legitimate economic inquiry.

22  In the second step, Professor McFadden estimated the app and in-app prices that

23  consumers would have paid in the but-for world. Apple challenged Professor McFadden's pricing

24  model on five grounds:

25         1.      The model initially forecasted that about 5.8% of Apple accounts were uninjured.

26                In other words, the model forecast that plaintiffs' proposed class included many

27                accounts who were not harmed by Apple's allegedly anticompetitive conduct.

28                Largely due to errors identified by Apple's experts, Professor McFadden later

conceded that the model actually included 14.6% uninjured accounts.

2.  Professor McFadden also conceded that, at the time of decision, he had not fixed one of these errors—the use of fixed-dollar rather than percentage pricing, which at times created negative but-for prices. Given this concession, and the fact that the parties did not dispute that fixing the model to reflect percentage pricing would fix the problem, the Court rejected Apple's argument that Professor McFadden's model otherwise generated negative but-for prices.

3.  The Court did find that Professor McFadden's opinion that Apple's focal-point pricing and pricing tiers would not exist in the but-for world lacked foundation and ignored overwhelming evidence to the contrary.

4.  Apple argued that Professor McFadden's model was not sufficiently robust for three reasons—the sample size was too small; the model easily allowed for accounts to switch from harmed to unharmed; and it estimated a wide variation of unharmed accounts depending on the sample size. The Court found that Professor McFadden had sufficiently supported his use of a 0.1% sample size. Given that the model required adjustment, the Court granted Apple's motion as to the robustness of Professor McFadden's model without ruling on its other arguments. The Court did, however, order plaintiffs to address the confidence level of the model in the next round of briefing.

5.  Apple contended that Professor McFadden's decision to exclude free apps from his model ignored market realities. Because free apps were excluded from Professor McFadden's impact calculations and the proposed class definition, the Court rejected Apple's argument.

In the third and final step, Professor McFadden proposed a method for separating harmed from unharmed class members. Though the Court found that the method of identifying the class members—matching Apple IDs to actual customers through Apple's internal records—was sufficiently objective, plaintiffs' approach with respect to timing was unacceptable. The Court advised plaintiffs that it could not wait until *after trial* to ascertain which class members were

4

uninjured.  While perhaps acceptable in a settlement context, plaintiffs had no legal basis for addressing a core merits issue after trial.

Ultimately, the Court granted plaintiffs leave to amend their expert's report and noted that it expected that many of the identified issues could be fixed.

### 2.    PREVIOUS CLASS CERTIFICATION MOTION

The Court also analyzed plaintiffs' class certification motion and found that plaintiffs met all the Rule 23(a) requirements.

Four common questions capable of class-wide resolution existed. First, the relevant market. Plaintiffs proffered Professor McFadden's definition of the market: a single aftermarket of the sale of iOS apps and in-app content. Apple criticized this definition, arguing that the relevant market was a two-sided transaction platform. The Court found that, for purposes of class certification, Professor McFadden's opinion on the market definition constituted common proof, though it declined to rule on its merits. The Court also found that Professor McFadden put forth common proof that could resolve the question of Apple's power in the market, its willfulness in acquiring and maintaining a monopoly, and whether it had violated Section 2 of the Sherman Act by monopolizing the market for iOS apps and in-app content.

Without Professor McFadden's methodology, many of the same issues addressed in the *Daubert* context led the Court to find that plaintiffs could not meet the predominance requirement of Rule 23(b)(3). Plaintiffs had not shown that the impact or damages of Apple's allegedly anticompetitive conduct could be proven on a classwide basis. With respect to antitrust impact, because Professor McFadden's methodology could not then reliably ascertain how many class members were unharmed by Apple's allegedly anticompetitive conduct, individual questions would predominate. With respect to antitrust damages, the Court rejected plaintiffs' proffer that they would run Professor McFadden's model after trial to determine classwide damages as too speculative.

* * *

Since the Previous Order, plaintiffs have filed a revised supplemental expert report by Professor McFadden. They also filed a new expert report by Dr. Rosa Abrantes-Metz, an expert in

United States District Court
Northern District of California

econometrics, statistics, transaction pricing, and payment processing, to calculate anew Apple's but-for commission rate. Based on those expert reports, plaintiffs renewed their motion for class certification. Apple then moved to exclude the new testimony of both of plaintiffs' experts and opposed the renewed motion for class certification.

## II.   *DAUBERT* MOTION

Because the Court's *Daubert* analysis informs the rest of its decision, the Court begins there. It then proceeds to analyze plaintiffs' renewed motion for class certification.[2]

### A.   LEGAL FRAMEWORK

Federal Rule of Evidence 702[3] provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise <u>if the proponent demonstrates to the court that it is more likely than not that</u>:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the <u>expert's opinion reflects a reliable application of</u> the principles and methods to the facts of the case.

At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis which

---

[2] The Court references various reports from plaintiffs as follow: Professor McFadden's Opening Report from June 1, 2021 (Dkt. No. 443-14, "McFadden's Opening Report"); Professor McFadden's Reply Report from October 19, 2021 (Dkt. No. 554-5, "McFadden's Reply Report"); Professor McFadden's Second Revised Supplemental Report (Dkt. No. 679-1, "McFadden's 2nd Supplemental Report"); Professor McFadden's Second Reply Report from April 28, 2023 (Dkt. No. 708-2, "McFadden's Second Reply Report"); and Professor McFadden's Declaration (Dkt. No. 702-2, "McFadden's Decl.").

For Dr. Abrantes-Metz there are: Dr. Abrantes-Metz's Opening Report from September 26, 2022 (Dkt. No. 666-2, "Dr. Abrantes-Metz's Opening Report"); Dr. Abrantes-Metz's Reply Report from April 28, 2023 (Dkt. No. 708-3, "Dr. Abrantes-Metz's Reply Report"); and Dr. Abrantes-Metz's Declaration (Dkt. No. 702-3, "Dr. Abrantes-Metz's Decl.").

For Apple's experts, there are: Professor Jeffrey T. Prince's Report from March 10, 2023 (Dkt. No. 668-5, "Prince Report"); Professor Lorin M. Hitt's Report from March 10, 2023 (Dkt. No. 688-3, "Hitt Report"); Professor Mark Watson's Report from March 10, 2023 (Dkt. No. 688-6, "Watson Report"); and Professor Richard Schmalensee's Report from March 10, 2023 (Dkt. No. 688-4, "Schmalensee Report").

[3] The Supreme Court updated the rule effective December 1, 2023. The changes are underlined. *See* https://www.supremecourt.gov/orders/courtorders/frev235468.pdf.  The new language does not change the intent of the rule, rather it provides further clarity.

United States District Court
Northern District of California

scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir. 2020). "Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [their] methodology." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks and citation omitted).

### B.   PROFESSOR MCFADDEN'S CHALLENGED OPINIONS

Apple submits that Professor McFadden has failed to fix the deficiencies in his model identified by the Court in its Previous Order. Plaintiffs disagree. The Court analyzes each argument.

#### 1.   METHODOLOGY

Apple challenges Professor McFadden's methodology on: (a) marginal costs; (b) in-app purchase prices; (c) price tiers and focal prices; and (d) developer competition.

##### a.   MARGINAL COSTS

First, Apple argues Professor McFadden's model overestimates marginal costs. Even though, according to Apple, it is "textbook economics that digital goods have low or zero marginal costs," Apple believes the model is engineered to find positive marginal costs for every app and in-app purchase which leads to overestimation of marginal costs. Apple supports this position by pointing to the "natural experiments" its experts ran on the model.

The Court disagrees. Apple misconstrues Professor McFadden's model; in it, marginal cost is calculated based on app developers' "*variable* costs." (McFadden's Opening Report ¶ 185 (emphasis in original).) Professor McFadden defines a "variable cost" as an expense that "varies in proportion to production output." (*Id.* ¶ 185; *see also* McFadden's Decl. ¶ 5.) In other words, when Professor McFadden posits that app developers have marginal costs, he is looking at how costs change not when producing one additional unit of a digital good but when operating at scale. (McFadden's Reply Report ¶¶ 73–74.) So, for example, when Professor McFadden states that Fortnite incurs marginal costs, he is not talking about the marginal cost of creating one more unit of its digital currency, "V-bucks," but "all of the different variable costs that come along with [its]

United States District Court
Northern District of California

1   iOS app monetization business." (*Id.* ¶ 74.)

2   Moreover, Professor McFadden provides examples of positive variable costs. (McFadden's

3   Opening Report ¶¶197–208.) User acquisition costs, for example, tend to rise with revenue,

4   suggesting that they are variable, rather than fixed, costs. (*Id.* ¶ 198.) Streaming costs are another.

5   (*Id.* ¶ 201.) When a user streams a song on Spotify, for example, Spotify pays a royalty fee. (*Id.*

6   ¶ 206.) Apple does not address either example of positive variable cost but at least one of Apple's

7   experts, Professor Hitt, conceded when presented with such examples that marginal costs could be

8   "meaningful." (McFadden's Reply Report ¶ 73 n.138.)

9   Lastly, Apple argues that its experts' "natural experiments" undermine how Professor

10   McFadden computed marginal costs. Apple has lowered its commission rate three times. (Hitt

11   Report ¶ 41.) Each time it did, prices mostly stayed the same. Apple extrapolates that such a result

12   shows that in a digital marketplace "products have zero or negligible marginal cost."[4] By way of

13   illustration, Professor Hitt proffers Apple's Small Business Program ("SBP"), introduced in

14   December 2020. (*Id.* ¶ 55.) The SBP reduced Apple's commission rate to 15% for paid

15   transactions for app developers who earned less than or equal to $1 million in net proceeds. (*Id.*)

16   The program was voluntary. Professor Hitt then analyzed whether app developers who

17   participated in the program lowered their prices in response by comparing what their prices were

18   six months before the program and six months after. (*Id.* ¶ 56.) Professor Hitt concluded that most

19   participants did not reduce their prices.

20   At most, Professor Hitt's conclusions on the natural experiments go to weight, not

21   admissibility. The "test under *Daubert* is not the correctness of the expert's conclusions but the

22   soundness of his methodology." *Daubert,* 43 F.3d at 1318. Apple's analysis of Professor Hitt's

23   natural experiments say nothing about Professor McFadden's methodology; instead, they articular

24   a different perspective on what would have happened in the but-for world. That perspective does

25

26   _____

   [4] Apple also states that, in a deposition, Professor McFadden admits that he did not test his
27   model against these natural experiments. That is not what Professor McFadden said. In response to
   the question of whether he thought that "it is likely that marginal costs, as you estimate them,
28   would change at the exact same time as a change in the commission rate," Professor McFadden
   responded he had not "examined" that particular issue. (McFadden 3d Deposition at 160:15–23.)

1  not discredit Professor McFadden's testimony about how all app developers across the App Store

2  would have priced their apps and in-app content had Apple's commission rate always been

3  13.63% rather than 30%. "The question of what would have happened but for [defendant's]

4  monopoly overcharge is a hypothetical, and a hypothetical question generally cannot be answered

5  by historical data about what actually happened but must often be answered by general principles

6  about what generally tends to happen." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D.

7  583, 605 (N.D. Cal. 2010) (internal citation and quotations omitted); *see also In re Lithium Ion*

8  *Batteries Antitrust Litig.*, 2017 WL 1391491, at *11 (N.D. Cal. Apr. 12, 2017) ("Determination of

9  the difference between prices paid and prices that would have been paid 'but-for' the unlawful

10  conduct is necessarily hypothetical.")

11        Professor McFadden has demonstrated that calculating marginal costs at the app, rather

12  than individual item, level is reliable.[5] For that reason, the motion on this ground is **DENIED.**

13                 **b.**    **IN-APP PURCHASE PRICES**

14        Apple next argues that Professor McFadden's model cannot predict what individual in-app

15  purchase prices would be but for Apple's allegedly anticompetitive conduct and therefore cannot

16  reliably calculate damages. (*See* McFadden's 2nd Supplemental Report ¶ 42.)

17        As explained in its Previous Order, the Court understands that Professor McFadden

18  calculates prices at the "app level" rather than the "individual app purchase level." (Previous

19  Order at 10.) He does so because he opines that app developers consider costs at the app level

20  when setting prices. (*Id.*) Thus, when he built his model, Professor McFadden averaged the prices

21  of all in app content in an app, per month. (*Id.*) He then calculated the but-for prices at the *app*

22  level to estimate damages. (McFadden's 2nd Reply Report ¶ 108.) The Court declined in the

23  previous round of briefing to exclude Professor McFadden's model because he calculates but-for

24  prices at the app, rather than individual, level and it will not revisit that decision here.

25        Apple next challenges Professor McFadden's use of the "percentage method" to estimate

26

27                  _____

28        [5] As Professor Prince acknowledged, "economists think about short run and long run." (Dkt. No. 702-5, 2023 Prince Dep. 70:15.) The perspective of the analysis, therefore, is "going to impact how [economists] think about [costs] being variable or marginal." (*Id.*)

9

damages. In its Previous Order, the Court excluded Professor McFadden's model because it generated negative but-for prices. The parties then agreed the issue could be fixed if Professor McFadden applied the percentage rather than fixed-dollar method. (Previous Order at 11.) Professor McFadden now uses the percentage method to estimate damages. (McFadden's 2nd Supplemental Report ¶ 40.)

Apple now argues that even though Professor McFadden applies the percentage method, he changes the price of every as-is in-app item by the same percentage to calculate the but-for price, a method that is scientifically unsound. The Court disagrees with Apple's characterization. As Professor McFadden states, he uses "the percentage method to estimate damages for each transaction, not to *predict* item level prices." (McFadden's 2nd Supplemental Report ¶ 37.) Instead, he calculates how much Apple overcharged consumers as a percentage of its total revenues. (*Id.* ¶ 40.) Professor McFadden then calculates individual damages by taking this percentage and multiplying it against each individual's spending on a particular app, in a particular month. (*Id.* ¶ 41.) To illuminate, Professor McFadden gives the example of two users, one who spends $0.99 on an app, the other $9.99. (*Id.* ¶ 41.) Using Dr. Abrantes-Metz's but-for commission rate of 13.63%, Professor McFadden concluded that Apple's overcharge for that particular app was 35.5% in January 2018. (*Id.*) At the as-is commission rate of 30%, Apple's revenue from the first user was $0.297, for the second user $2.997. The users were therefore overcharged by $0.105 (35.5% of $0.297) and $1.064 (35.5% of $2.997), respectively.

As now applied, the Court finds the percentage method sufficiently reliable. For that reason, the motion on this ground is **DENIED.**

### c.    PRICE TIERS AND FOCAL-POINT PRICING

The Court previously excluded Professor McFadden's model because it ignored Apple's price tiers and focal-point pricing. (Previous Order at 11–12.) Apple argues that Professor McFadden's model still ignores the issue.

In their renewed motion for class certification, plaintiffs maintain their challenge to Apple's price tiers. For that reason, Professor McFadden explains, he has created two models, one without price tiers and one which incorporates tier and focal pricing. (McFadden's 2nd

1   Supplemental Report ¶ 85.) Professor McFadden conducts a simulation with Apple's current price

2   tiers, using the same 0.1% sample he uses generally to calculate damages. (*Id.* ¶ 87.) At the app-

3   level, Professor McFadden assumes that developers choose their app and average in-app content

4   prices consistent with the increments set out in Apple's tier schedules. (*Id.*) Within these

5   restrictions, Professor McFadden models that app developers set the prices that will result in

6   maximized profits. (*Id.*) In the same way, Professor McFadden's model demonstrates that it can

7   accommodate focal-point pricing. (*Id.* ¶ 88.) Professor McFadden acknowledges that, with the

8   current tier and focal pricing, the percentage of unharmed accounts is higher. (*Id.* ¶ 90.)

9            Professor McFadden then conducted a simulation using a more granular, 750-point pricing

10  structure. (*Id.* ¶ 93.) He did so because, as part of its settlement with app developers, Apple

11  announced that it would introduce such a pricing schedule. (*Id.* ¶ 94.) Using this more granular

12  pricing structure, Professor McFadden calculates that the percentage of unharmed accounts would

13  be similar to a but-for world with no pricing tiers. (*Id.* ¶ 95.)

14           The Court finds that Professor McFadden's tier and focal pricing simulation is sufficiently

15  reliable. Whether proof exists that pricing tiers or a pricing schedule is, in fact, anticompetitive is a

16  merits question not before the Court and likely reasonably in dispute in any event. That Professor

17  McFadden's does not predict in-app prices ending at 99 cents is no surprise. As explained,

18  Professor McFadden averages all in-app content prices, ending in 99 cents, at the app-level. He

19  then restricts the movement of these averaged prices to change in increments consistent with

20  Apple's pricing schedule. This approach, Professor McFadden explains, is consistent with how

21  one of Apple's experts, Professor Prince, originally calculated the effect of price tiers. (McFadden

22  2nd Reply Report ¶ 51.)

23           Further, as Professor McFadden explains, his model does reflect the impact of focal-point

24  pricing through Apple's current pricing structure and the 750-point structure that Apple has stated

25  it will implement. Professor Prince disputes this, arguing that Professor McFadden's model does

26  not reflect "voluntary focal-point pricing." (Prince Report ¶ 148.) In so arguing, Professor Prince

27  ignores that the analysis of price tiers and focal point pricing is "interchangeable." (McFadden's

28  2nd Reply Report ¶ 55.) In other words, whether the impact of a price restriction is analyzed as a

United States District Court
Northern District of California

price tier—Apple requiring that all app prices end in $0.99—or as focal-point pricing—app developers would freely choose to price at 99-cent points—the effect is the same. Apple does not give the Court any reason to think otherwise.[6]

Finally, Apple's argument that Professor McFadden's model does not reflect the as-is world because he assumes that app developers set prices to maximize profits exactly rather than along one of Apple's price tiers does not persuade. Professor McFadden states that he simulates the but-for world by assuming that developers choose the prices that yield them the highest profits based on Apple's pricing schedule. (McFadden's 2nd Supplemental Report ¶ 87.) Moreover, Professor McFadden's model incorporates actual transaction data from the App Store, which already reflects Apple's pricing restrictions. Nothing further is required.

On that ground, Apple's motion is **DENIED.**

### d. APP COMPETITION

Lastly, Apple attacks Professor McFadden's methodology on the basis that it does not consider competition between app developers, instead treating them like monopolists to calculate the prices they would set in the but-for world. Put another way, Apple's expert Professor Prince argues that Professor McFadden assumes that app developers' prices are not sensitive to consumer demand. (McFadden's Reply Report ¶ 21.) Plaintiffs oppose, noting that Professor McFadden's model incorporates the reality of each app developer's competitive environment.

Apple again mischaracterizes Professor McFadden's methodology. Professor Prince contends that Professor McFadden's model:

> does not account for competition between apps, even within the same genre . . . . Instead, his model continues to assume that developers have no incentive to respond to changes in the price of other apps, even if they are in the same genre or offer a substitutable product.

(Prince Report ¶ 191.) This is incorrect. Professor McFadden's model does consider competition "through the price sensitivity of demand." (McFadden's Reply Report ¶ 120.) Modeling competition through demand captures "how readily consumers switch to other apps should an app

---

[6] In fact, in its *Daubert* motion, Apple noted that its price tiers and focal-point pricing had essentially the same impact. (Dkt. No. 476-11 at 22.)

12

United States District Court
Northern District of California

1   increase its price." (*Id.*) It is true, Professor McFadden notes, that his model does not include the

2   "strategic interactions between apps in the But-For world," but this decision, he argues is

3   "conservative."[7] (*Id.* at ¶ 122.)

4         Because Professor McFadden does model competition between apps by considering the

5   price sensitivity of demand in this section, the motion on this point is **DENIED.**[8]

6               **2.**    **SUFFICIENCY OF DATA**

7         Apple challenges the sufficiency of Professor McFadden's data. It argues that Professor

8   McFadden uses a two-step process to estimate consumer price sensitivity. In the first step, Apple

9   states, Professor McFadden runs a regression on a 0.1% sample of transactions from the App Store

10  to get a coefficient. In the next step, Apple continues, Professor McFadden constrains that

11  coefficient by using profit margin bounds derived from a "tiny and unrepresentative" sample of six

12  app developers. Apple concludes that the Court should reject Professor McFadden's model for

13  imposing arbitrary and unrepresentative constraints.

14        To start, Apple again mischaracterizes the model. Professor McFadden does not proceed in

15  two steps—he calculates consumer price sensitivity with the requisite constraints in one step.

16  Apple has nothing to say against the reliability of this approach, which Professor McFadden

17  presents as a "standard computation tool." (McFadden's Decl. ¶ 80.)

18        Instead, Apple expends much ink arguing that Professor McFadden's margin bounds were

19  both arbitrarily chosen and imposed. The Court is not persuaded. First, plaintiffs note that, when

20  the model was initially run, Professor McFadden only had access to six developers' data. By trial,

21  plaintiffs state that they will receive profit data from significantly more developers and Professor

22  McFadden will correspondingly update his estimated coefficients. That is sufficient at this stage.

23  (*See* Previous Order at 10 n.8.) Moreover, Professor McFadden has produced unrebutted evidence

24

25         [7] Apple also argues that Professor McFadden's methodology is flawed because it does not
consider that "many apps are not subject to Apple's commission, so a change in commission rate
26  may not translate to a decrease in the competitive price for competing apps." The Court previously
rejected Apple's argument that Professor McFadden should have considered free apps in his
27  demand equation and does so for the same reasons now. (Previous Order at 13–14.)

28         [8] In fact, in the very next section, Apple acknowledges that a "pivotal step" in Professor
McFadden's model is "estimating price sensitivity."

that economists often infer costs, rather than inputting actual cost data, to estimate demand because firms do not typically disclose their costs. (McFadden's Reply ¶ 148.) That Professor McFadden can input actual app developer's costs here, even if minimal, increases the model's reliability.

Second, Apple contends that Professor McFadden has no "objective methodology" for translating his cost data into margin bounds and "instead appears to rely loosely on his review" of the available app developer data. As an example, Apple notes that Professor McFadden calculates the profit constraints for the Games Genre in the 60% to 90% range. This is so, Apple states, despite the fact that the lowest actual profit margin he observed was 64% and the highest was 92.2%. This is a minor quibble—Professor McFadden notes from the beginning that he is using these six developers' data to *estimate*, not precisely quantify, the average profit margin for the sake of class certification. (McFadden's Reply Report ¶ 151.)

Third, Apple's contention that if Professor McFadden removed or changed the margin constraints, the results would change, is a point in favor of the model's reliability, not against. If the inputs change, then the results *should* change as well.

On this ground, the motion is **DENIED.**

### 3. RELIABILITY

Apple next argues that Professor McFadden's model remains insufficiently robust by (i) failing to consistently determine the percentage of unharmed accounts depending on the sample used and (ii) producing different results even when using the same sample. Moreover, even though Professor McFadden has now clarified the confidence level of the model, Apple contends that this only masks how even slight changes to its margin constraints can cause millions of accounts to switch from harmed to unharmed.

In the Court's Previous Order, it noted that Professor McFadden's model had a "switcher" problem: the same account could switch from harmed to unharmed depending on which 0.1% sample he used to calculate damages. The Court asked plaintiffs to address the issue. Plaintiffs have now done so.

In his revised report, Professor McFadden first points out that switching is a natural

United States District Court
Northern District of California

1  consequence of using different samples which have different apps, transactions, and customers and

2  therefore different margin constraints. (McFadden's 2nd Supplemental Report ¶ 50.) To account

3  for and minimize this sampling error, Professor McFadden has now drawn seventy-five 0.1%

4  samples, estimated consumer demand based on these samples, taken the average of the seventy-

5  five coefficients obtained, and used the averaged coefficients to estimate damages across all

6  transactions from the App Store at a 95% confidence level. (*Id.* ¶ 54.)

7        Apple now pivots to a different argument. It contends that Professor McFadden has a

8  switcher problem because accounts change from harmed to unharmed depending on the margin

9  constraint used. McFadden explains that this is a feature not a bug. Logically, if Apple changes the

10  margin constraints of the model—by, for example, arbitrarily imposing a 70%-90% profit range to

11  make its point rather than the 60%-90% estimated by Professor McFadden—many accounts will

12  switch from harmed to unharmed.[9]

13        When actually using the same samples and constraints as Professor McFadden, Apple's

14  own expert arrived at consistent results. Instead of using seventy-five 0.1% samples and then

15  averaging them, Apple's expert Professor Watson used a 7.5% sample that contained the same

16  accounts. (McFadden's Decl. ⁋ 91.) Professor Watson's slightly different method produced

17  slightly different results: a lower price sensitivity that resulted in 2.2% fewer harmed accounts.

18  (*Id.* at ⁋ 92.) Apple notes that this equals 3.9 million accounts switched but ignores that 170

19  million stayed the same. (*Id.*) This does not shake Professor McFadden's 95% confidence interval

20  but instead serves to confirm it. That the pool of putative class members is so high does not

21  change the result.

22        Again, Apple's arguments here go to weight, not admissibility. They are fodder for cross-

23  examination, not reason to exclude Professor McFadden's testimony. For the reasons set forth

24  above, Apple's *Daubert* motion on this ground is **DENIED.**

25

26      [9] The same goes for Apple's first argument—that when Professor McFadden fixed an issue

27  where certain apps were in the incorrect genre, a small percentage of accounts switched from
harmed to unharmed. Because different genres have different constraints in Professor McFadden's

28  model, this type of change demonstrates that the model reacts to different inputs as a reliable
model should.

C.    DR. ABRANTES-METZ'S CHALLENGED OPINIONS[10]

Dr. Abrantes-Metz opines that, in a but-for world, Apple would have charged a 13.63% commission rate in its App Store. Apple moves to exclude Dr. Abrantes-Metz's expert opinion on four grounds: (1) Dr. Abrantes-Metz has not applied her previous economics expertise to present her current expert opinion, producing an "accounting identity" rather than an economic model; (2) her but-for commission rate rests on untenable assumptions; (3) her inputs are unreliable; and (4) her benchmark analysis is arbitrary.[11] The Court evaluates each.

1.    RELIABLE APPLICATION OF EXPERTISE

First, Apple seeks to exclude the opinion on the grounds it is a product of an "accounting identity," rather than an economic model. Because this accounting identity lacks "any economic content or predictive power," Apple argues, Dr. Abrantes-Metz's analysis is not a reliable application of her expertise. This is most noticeable, Apple concludes, in her disregard of indirect network effects.

Dr. Abrantes-Metz is a Ph.D. economist specializing in industrial organization,

---

[10] Apple also argues that the Court must exclude Professor McFadden's entire model because, even though he relies on Dr. Abrantes-Metz's but-for commission rate, he never read the underlying report that justifies it.

Fed. R. of Evid. 703 permits an expert to base his opinion on "facts or data in the case that the expert has been made aware of." This includes data presented to the expert "outside of court and other than by his own perception." Fed. R. of Evid. 703, Notes of Advisory Committee. In that way, Rule 703 reflects the reality that it is now "common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). That is what Professor McFadden has done here—based his opinion in part on Dr. Abrantes-Metz's expertise in industrial organization and multi-sided platforms, expertise the Court previously noted he lacked. Whether the but-for commission rate is suspect, therefore, is properly addressed through Apple's challenge of Dr. Abrantes-Metz's opinion, not Professor McFadden's. Apple's *Daubert* motion on this ground borders on disingenuous and is therefore **DENIED.**  Counsel is cautioned not to engage in such specious arguments.

[11] In its supplemental brief on Judge Donato's recent order excluding the opinion of consumer plaintiffs' expert in *In re Google Play Store Antitrust Litig.*, No. 21-md-2981-JD (N.D. Cal. Aug. 28, 2023), Apple also argues that Judge Donato's order there supports excluding Professor McFadden and Dr. Abrantes-Metz's opinions here. The Court disagrees. Other than noting that Judge Donato's order excluded the proffered expert opinion for its unsupported assumptions, an argument Apple already makes in its *Daubert* motion, Apple does not explain how Judge Donato's order is relevant here.

United States District Court
Northern District of California

1   econometrics, and finance. (Dr. Abrantes-Metz's Opening Report ¶ 1.) She is currently the

2   Principal at the Brattle Group and Co-chair of its Global Antitrust and Competition Practice. (*Id.*)

3   Formerly, she was an adjunct professor at the Leonard N. Stern School of Business at New York

4   University, where she taught industrial organization and competitive analyses. (*Id.*) Before that,

5   she was an economist at the Federal Trade Commission. (*Id.* ¶ 2.) Plaintiffs present Dr. Abrantes-

6   Metz as a qualified expert on benchmark analyses that would have prevailed but-for allegedly

7   anticompetitive conduct. (*Id.* ¶ 3.) Apple does not challenge her expertise.

8           Dr. Abrantes-Metz asserts that she used her expertise to create an "economic model" to

9   calculate her but-for commission rate "based on the fundamental principles that an app store's

10  operating profit margin is equal to the difference between the revenue it earns and the costs it

11  incurs, and its revenue depends on its market share and the price (commission rate) it charges."

12  (*Id.* ¶ 21.) To apply that equation, Dr. Abrantes-Metz estimated that Apple would have a 76.9%

13  market share, while the hypothetical rival app store acquired the other 23.1%, using surveys

14  developed by one of Apple's experts. (*Id.* ¶ 35.) She then assumed that the rival app store's profit

15  margin would be 23%. (*Id.* ¶ 43.) Dr. Abrantes-Metz drew this figure from data about the

16  Microsoft Store, which in 2019 reported a profit margin of 23%. (*Id.*) The Microsoft Store is an

17  appropriate benchmark, Dr. Abrantes-Metz posited, because it is an established rival to Steam in

18  the sale of Windows PC game apps. (*Id.* ¶ 47.) This is analogous to the but-for world on which she

19  modeled her commission rate. (*Id.*) Finally, Dr. Abrantes-Metz assumes that a rival app store's

20  variable and fixed costs are the same as Apple's App Store (3.8% of total billings and $786

21  million, respectively). (*Id.* ¶ 55.) She then plugs these figures into her economic model to calculate

22  the but-for commission rate.

23          Apple's criticism is, essentially, that Dr. Abrantes-Metz erred in using an equation rather

24  than an economic model. This is pedantic; economic models generally consist of mathematic

25  equations that describe a theory of economic behavior. That Dr. Abrantes-Metz's economic model

26  consists of one mathematical equation does not mean that she has "no theory of economic

27  behavior underpinning her analysis," as Apple charges. Dr. Abrantes-Metz explains, step by step,

28  how she calculates the "fundamental principles" underpinning her equation. (*Id.* ¶ 21.) And though

17

Apple may disagree with her inputs (as analyzed below), it has nothing to say about why those fundamental principles are not a reliable application of her expertise.

Nor does Apple's argument that Dr. Abrantes-Metz fails to reliably apply her economic expertise by ignoring indirect network effects persuade. Dr. Abrantes-Metz relied on Professor McFadden's market definition—a single aftermarket for the sale of iOS apps and in-app content to consumers—in constructing her model. (*Id.* ¶ 20.) The Court previously found that Professor McFadden's market definition was sufficiently reliable for purposes of class certification. (Previous Order at 4.) In doing so, the Court rejected Apple's argument that Professor McFadden ignored the two-sidedness of Apple's App Store and its indirect network effects. (Dkt. No. 476-3.) As the Court already warned Apple, it will not reconsider that ruling.[12]

On that ground, Apple's motion is **DENIED.**

### 2.   ASSUMPTIONS

Apple next argues that Dr. Abrantes-Metz's model relies on untenable assumptions about the but-for world: (1) that Apple would only have one other competing app store; (2) both app stores would charge identical commission rates; and (3) the hypothetical app store would provide identical terms and services to the App Store.

First, Dr. Abrantes-Metz has sufficiently defended her assumption that, in the but-for world, the App Store would face one, smaller competitor. She conservatively chose to model a duopoly, rather than a market with multiple rivals, because of the unremarkable and well-supported proposition in economics that more competition equals lower prices. (Dr. Abrantes-Metz's Opening Report ¶ 36; Dr. Abrantes-Metz's Decl. ¶ 43.) Apple does not dispute this basic tenet but instead argues that, under Dr. Abrantes-Metz's model, having more than one rival app store would actually increase Apple's but-for commission rate. Professor Hitt, Apple's expert, arrives at this counterintuitive conclusion by changing the respective market shares in Dr. Abrantes-Metz's existing model while maintaining the same profit margins. (Hitt Report ¶ 296.)

---

[12] Apple also makes the argument that Dr. Abrantes-Metz erred by only considering some of the factors she has considered in other works. This argument relates to the strength of the opinion, not the reliability of the principles upon which it is based. (*See* Dr. Abrantes-Metz's Reply Report ¶ 40.)

United States District Court
Northern District of California

As Dr. Abrantes-Metz states, it makes no economic sense to presume that "more competition increases prices but does not reduce profitability." (Dr. Abrantes-Metz's Decl. ¶ 44.)

Second, Dr. Abrantes-Metz sufficiently explains her reason for postulating that, in the but-for world, Apple and its competitor would charge identical commission rates. In Dr. Abrantes-Metz's but-for world, Apple and the rival app store would have started at the same time and provided the same services. It follows, Dr. Abrantes-Metz argues, that they would have charged the same price, or commission rate, to their consumers. (Dr. Abrantes-Metz's Report ¶ 28; Dr. Abrantes-Metz's Decl. ¶¶ 68–69.) This is not true of just the but-for world; in the as-is world, competitors like Microsoft and Steam charged the same commission rate for years until a new competitor, Epic Games, forced Microsoft to *lower* its commission rate. (Dr. Abrantes-Metz's Decl. ¶ 73.) If anything, these benchmarks demonstrate that assuming an identical commission rate among the two competitors Dr. Abrantes-Metz posits would exist in the but-for world is conservative.

Moreover, Dr. Abrantes-Metz explained why her model predicts that, in the but-for world, Apple would charge a single rate, rather than tiered rates. While tiered rates in the but-for world are possible, Dr. Abrantes-Metz explains, she does not think they are likely because commission rates would be much closer to costs. (Dr. Abrantes-Metz's Reply Report ¶ 60 n.114.) If she had modeled a tiered commission rate system, Dr. Abrantes-Metz notes, her predicted 13.63% but-for rate would be at the higher tier, not the lower. (*Id.* ¶ 63.) This is because she modeled her but-for commission rate on Microsoft's profits from game sales in 2019, when Microsoft charged a 30% commission rate on games and a 15% commission rate on non-game apps. (*Id.*)

Third, Dr. Abrantes-Metz's assumption that Apple and its hypothetical rival would provide identical services in the but-for world is well explained. Dr. Abrantes-Metz's cites to economic literature for the proposition that two competitors in a duopoly would provide the same services. (Dr. Abrantes-Metz's Opening Report ¶ 28 n.14.) Apple's experts do not contest that economists use symmetric competitors to design economic models—one of Apple's experts, Professor Hitt, stated in his deposition that it is not an "unusual assumption"—but instead speculate that in the but-for world Apple might try to differentiate itself by, for example, offering a consumer rewards

1  program. (Schmalensee Report ¶ 92.) Such speculation in the face of widely accepted principles

2  goes to weight, not admissibility.

3      For those reasons, Apple's motion in this regard is **DENIED**.

4          **3.    INPUTS**

5      Apple next argues that, even if Dr. Abrantes-Metz's model is sound, her inputs are not.

6  Apple first takes issue with the fact that Dr. Abrantes-Metz assumes that the relevant market in the

7  but-for world was at all times the same as it was in 2019. Dr. Abrantes-Metz's model, in fact, does

8  not assume a constant market size; instead, she assumes that *billings* in the as-is and but-for world

9  are the same. In other words, she assumes that billings would not increase as a result of lower

10  commission rates. (Dr. Abrantes-Metz's Opening Report ¶ 56; Dr. Abrantes-Metz's Decl. ¶¶ 79–

11  81.) This, she explains, is a conservative assumption because modeling that billings would

12  *increase* in the but-for world would result in a *lower* but-for commission rate. Dr. Abrantes-Metz

13  did take into account other market sizes when she, for example, input Apple's app billings from

14  2018 (not 2019) to check her model. (Dr. Abrantes-Metz's Reply Report ¶ 106.)

15      As another example, Apple attacks Dr. Abrantes-Metz's use of only one platform—

16  Microsoft—to determine the rival app store's profit margin in the but-for world. Dr. Abrantes-

17  Metz, however, sufficiently explained her process for choosing Microsoft as an input. (Dr.

18  Abrantes-Metz's Opening Report ¶ 43.) To model a duopoly, she looked for an app store that had

19  a high enough profit margin to support its entry and continued operation in the market but not so

20  high it would attract other rivals. (Dr. Abrantes-Metz's Decl. ¶ 115.) She researched various

21  choices and explained why she rejected them—noting that the Google Play store is accused of

22  charging anticompetitive prices while Epic Games is known to charge a below-competitive one.

23  (Dr. Abrantes-Metz's Opening Report ¶¶ 66, 90.) She then explained that she ultimately settled on

24  Microsoft because it had a similar functionality to the Apple app store; was an established,

25  profitable rival to a larger competitor, Steam; and using its 2019 profile allows Dr. Abrantes-Metz

26  to calculate what Microsoft's profit margin was after a new competitor, Epic Games, entered the

27  market but before Microsoft cut its commission rates in response. (Dr. Abrantes-Metz's Decl.

28

United States District Court
Northern District of California

20

¶ 125.)[13]

Finally, Apple argues that Dr. Abrantes-Metz's input for the hypothetical rival store's market share is unfounded. Dr. Abrantes-Metz used the survey results from Apple's own expert, Dr. Simonson, to conclude that Apple and its hypothetical rival would have a 76.9/23.1% split of the market. As Dr. Abrantes-Metz explained, this is a conservative input in Apple's favor—in that but-for world, Apple's share of the market would still be highly concentrated. (Dr. Abrantes-Metz's Opening Report ¶ 113.) In fact, another of Apple's experts noted that it would have been reasonable for Dr. Abrantes-Metz to model a 50/50% split with a lower but-for commission rate. (Dr. Abrantes-Metz's Reply Report ¶ 114.) Yet Apple argues that, if Dr. Abrantes-Metz is using the Microsoft Store's profit margin from 2019, she should input its 2019 market share of 7.7% as well into her model. Dr. Abrantes-Metz explains why she rejects the resulting 92.3/7.7% split—it is far too concentrated to be a model of a truly competitive duopoly where both competitors entered the market on the same footing. (Dr. Abrantes-Metz's Opening Report ¶ 110.)  Dr. Abrantes-Metz has sufficiently justified the opinion. Apple's objection may be reraised on cross-examination.

Apple's motion on this point is **DENIED.**

### 4. BENCHMARK ANALYSIS

Finally, Apple argues that Dr. Abrantes-Metz's benchmark comparison is cherry-picked. To check her conclusion that, in the but-for world, Apple's commission rate would be 13.63%, Dr. Abrantes-Metz did a benchmark marketplace analysis. A good benchmark must "share key features of the relevant marketplace in question, while at the same time being as free as possible of anti-competitive conduct." (Dr. Abrantes-Metz's Reply Report ¶ 168.) She first considered various candidates: the Windows PC Game apps, Android apps, MacOS apps, and Steam games. Dr.

---

[13] In its Reply, Apples argues for the first time that Dr. Abrantes-Metz's but-for commission rate should be excluded because while Microsoft's profit margin (on which Dr. Abrantes-Metz relied) was 23% in 2019, in 2020 it was 55% while in 2021 it was 43%. Arguments presented for the first time on reply are disfavored and can be disregarded. In any case, Dr. Abrantes-Metz already explained why she thought Microsoft's *2019* profit margin was particularly well-suited, as explained above. Moreover, even with a 13.63% but-for commission rate, Dr. Abrantes-Metz still calculates that Apple would earn a 57.2% profit. (Dr. Abrantes-Metz's Opening Report ¶ 23.) That is sufficient.

United States District Court
Northern District of California

1    Abrantes-Metz explained why she rejected those benchmarks. For example, she states, Google

2    purportedly raised barriers to entry by requiring Android device manufacturers to prominently

3    display the Google Play store on their devices while Epic Games lowered its commission rate to

4    break into the marketplace at the cost of negative operating profits. (Dr. Abrantes-Metz's Opening

5    Report ¶ 49.) In the end, she concluded that the Windows Store was the most appropriate

6    benchmark for two reasons: the Windows Store and Apple App store are similar in the services

7    they provide, and, unlike Apple, Microsoft does not impose significant barriers to entry. (Dr.

8    Abrantes-Metz's Opening Report ¶ 64.)

9        Apple does not dispute that Windows Store is a suitable benchmark.[14] Instead, it argues

10   that Dr. Abrantes-Metz excluded other benchmarks with 30% commission rates, like the Google

11   Play Store and Steam, while including the 12% commission rates of Microsoft and Epic Games in

12   her analysis. As stated above, Dr. Abrantes-Metz excluded the Google Play Store because of its

13   allegedly anticompetitive conduct.[15] Given that an important part of conducting her check was

14   finding a benchmark as free as possible of anticompetitive conduct (a qualification Apple does not

15   contest), Dr. Abrantes-Metz sufficiently explained why she excluded the Google Play Store.[16] Dr.

16   Abrantes-Metz did *not*, however, exclude Steam from her analysis. (Dr. Abrantes-Metz's Opening

17   Report ¶ 119; Dr. Abrantes-Metz's Reply Report ¶ 170.) Though Dr. Abrantes-Metz argued that

18   Steam *should* be excluded because of its anticompetitive conduct, she ran her benchmark analysis

19   *with* Steam and found that the but-for commission rate would range from 13.91%-14.18%, which

20

21        [14] Apple does argue that Dr. Abrantes-Metz was inconsistent in considering Google's
22   anticompetitive conduct but ignoring the fact that the Federal Trade Commission recently sued
     Microsoft over its significant power in the video game market. But, as Dr. Abrantes-Metz states,
23   FTC's complaint was over Microsoft's proposed merger with Activision, which had not taken
     place and so could not have influenced its then-existing commission rate. (Dr. Abrantes-Metz's
24   Reply Report ¶ 165.)

25        [15] A jury recently convicted Google for the anticompetitive policies of its Play Store. *In re
     Google Play Antitrust litigation*, No. 21-md-2981-JD.

26
          [16] Dr. Abrantes-Metz also explained why the Amazon and Samsung Stores were not
27   suitable benchmarks for the deployment of Android apps: given Google's allegedly
     anticompetitive conduct, which has kept the Samsung Galaxy Store and Amazon Appstore from
28   becoming true rivals in this space, neither was a good example on which to model a truly
     competitive duopoly. (Dr. Abrantes-Metz's Reply Report ¶ 143.)

1  was consistent with her final rate of 13.63%. (Dr. Abrantes-Metz's Reply Report ¶ 170.)

2  Moreover, Dr. Abrantes-Metz adequately defended her decision to include Microsoft and

3  Epic Games' 12% commission rate. Though Microsoft charged a 30% commission rate in its PC

4  games store and stated it would not lower its commission rate on its platform, once Epic Games

5  entered the market, Microsoft eventually did lower its commission rate to 12% in response. (Dr.

6  Abrantes-Metz's Opening Report ¶¶ 111–113.) Dr. Abrantes-Metz concluded that including the

7  way Microsoft changed its commission rate when faced with "stiff competition" in her analysis

8  was a useful predictor of what the range of commission rates would look like for Apple in the

9  more competitive, but-for world. (*Id.* ¶ 115.)

10  Finally, Apple argues that Professor Abrantes-Metz's analysis was skewed by including

11  direct-to-consumer platforms, or platforms that distribute their own apps. As Dr. Abrantes-Metz

12  explains, however, including direct-to-consumer platforms, which do compete in the same market,

13  is the more holistic approach. Moreover, Apple's argument that direct-to-consumer platforms

14  should be excluded because they do not face the same costs ignores that self-distribution is not

15  "free"; direct-to-consumer platforms have to choose between the costs of building and marketing a

16  new platform or paying the commission rates of established ones like the Apple App Store. In

17  either situation, there are distribution costs involved.

18  Apple's *Daubert* motion is **DENIED.**

19  ## III.   CLASS CERTIFICATION

20  Plaintiffs once again move for class certification under Rule 23(b)(3) based on Apple's

21  allegedly anticompetitive conduct. In its Previous Order, the Court found that plaintiffs met the

22  requirements of Rule 23(a) which are summarized above. Here, therefore, it analyzes only whether

23  plaintiffs can now satisfy the predominance requirement of Rule 23(b)(3).

24  ### A.   LEGAL FRAMEWORK

25  Under Rule 23(b)(3), a court must find that "the questions of law or fact common to class

26  members predominate over any questions affecting only individual members, and that a class

27  action is superior to other available methods for fairly and efficiently adjudicating the

28  controversy." "An individual question is one where 'members of a proposed class will need to

United States District Court
Northern District of California

present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). The "predominance inquiry asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting 2 W. Rubenstein, 2 Newberg on Class Actions § 4:49 (5th ed.)).

"In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence," including expert evidence. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). Just because the proffered expert evidence is admissible, however, does not mean that a court can certify a class. A court must decide if the expert's methodology is "capable of showing class-wide antitrust impact" in light of "factors that may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs)."

### B. PREDOMINANCE

In its Previous Order, the Court excluded plaintiffs' expert testimony and thus found they could not satisfy the predominance requirement.[17] Now that the Court has found otherwise, the only dispute left is whether plaintiffs can prove antitrust injury on a classwide basis.[18]

Core to the predominance analysis is whether plaintiffs' class definition sweeps in a statistically significant number of uninjured class members. In the last round of briefing, plaintiffs conceded that their class definition included an estimated 14.6% of uninjured class members. (Previous Order at 23.) The Court then noted that the Ninth Circuit had not "squarely addressed

---

[17] The Court previously expressed its concern with plaintiffs' proposed plan of proving classwide damages by running Professor McFadden's model after trial. (Previous Order at 25–27.) Plaintiffs have now affirmed to the Court that Professor McFadden will calculate both aggregate and individual damages *before trial* with the full transactions data of the entire App Store. Given that, the Court now finds that plaintiffs have satisfied the predominance requirement as to damages.

[18] In its opposition to plaintiffs' motion for class certification, Apple raises many of the same arguments made in its *Daubert* motion. The Court incorporates its analysis above but does not regurgitate the reasons for rejecting the arguments.

the issue of whether a particular percentage of uninjured class members defeats predominance," but, given the errors in Professor McFadden's methodology, the Court found that individual issues would predominate regardless because plaintiffs could not reliably identify which class members, and how many, were injured. (Previous Order at 25.)

Plaintiffs now seek to narrow the class. Plaintiffs currently estimate that 17.8% of Apple accounts have not suffered an overcharge due to Apple's allegedly anticompetitive conduct. (McFadden's 2nd Supplement Report ¶ 16.) Because there are many more accounts than iPhone users, plaintiffs surmise that the actual number of class members that are uninjured is significantly lower. In any case, in response to the Court's overbreadth concerns, plaintiffs have now narrowed their class definition to only include Apple account holders who have spent $10 or more on app or in-app content. Under this narrowed definition, Professor McFadden estimates that the class includes only 7.9% uninjured members. (*Id.*)

Notably, since the Court's Previous Order, an *en banc* panel of the Ninth Circuit rejected the argument that "Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members." *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022). Nevertheless, the Ninth Circuit stated, a district court "must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Id.* at 669 n.14. The problem with a class definition that includes uninjured class members is "the obverse of a different problem with class definition: the problem of the 'fail-safe' class: one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). "Defining a class so as to avoid, on one hand, being over-inclusive and, on the other, the fail-safe problem is more of an art than a science." *Id*. Both, however, "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Olean*, 31 F.4th at 669 n.14 (quoting *Messner*, 669 F.3d at 825).

In *Olean*, defendants argued on appeal that the district court abused its discretion in certifying a class that potentially included 28% uninjured class members. 31 F.4th at 680. The

United States District Court
Northern District of California

Ninth Circuit rejected this argument, holding that all that is necessary at the class certification stage is a finding that an expert's model was "*capable* of showing" that all class members suffered antitrust impact on a classwide basis, even those with "limited transactions." 31 F.4th at 681.

The same is true here. Professor McFadden's model can show the impact of Apple's allegedly anticompetitive conduct across all class members. He has now run his revised model on all the App Store transactions across the Games, Music, and Entertainment genres and can compute which Apple accounts suffered damages and which did not. Plaintiffs have represented to the Court that, once Apple produces the rest of its app transactional data, Professor McFadden will be able to calculate the exact extent of injury suffered by each class member. Acknowledging that an estimated 17.8% of accounts in Professor McFadden's model are uninjured, plaintiffs have revised their class definition to limit the number of uninjured class members.

While the Court remains concerned that the $10.00 cutoff results in an estimated 7.9% or 10,283,035 million uninjured accounts, it expects, given plaintiffs' representations, that once the model is fully run, that number will be reduced[19] or the cutoff could be changed to reduce the impact of including unharmed accounts. Accordingly, under *Olean*, the predominance requirement is met.

Apple's arguments otherwise do not persuade. According to Apple, *Olean* is distinguishable because all or virtually all class members in that case were harmed.[20] This is not the case—in *Olean*, up to 28% of the class was uninjured, significantly more than the 7.9% posited by plaintiffs here. It is true that in this case, the number of uninjured accounts numbers in

---

[19] *See* Dkt. No. 786-1, Declaration of Minjae Song, Ph.D. in Response to Order for Supplemental Information in Further Support of Renewed Motion for Class Certification. The attendant motion to seal is **GRANTED**.

[20] Apple argues also that the First Circuit's opinion in *In re New Motor Vehicle Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008), supports its position here. To start, the Ninth Circuit in *Olean* noted that *In re New Motor* was distinguishable because the First Circuit found that the case could not proceed on jurisdictional grounds and so the rest of its analysis on class certification was dictum. *Olean*, 31 F.4th at 678 n.26. In any case, Apple's arguments about why *In re New Motor* supports its position go to the admissibility of Professor McFadden's model, rather than whether it provides common evidence in support of class certification. The Court rejects these arguments for the same reason it denies Apple's *Daubert* motion.

the millions. The Ninth Circuit in *Olean*, however, rejected the argument that Rule 23 has an uninjured class member cutoff beyond which class certification is impermissible. That position is "inconsistent with Rule 23(b)(3), which requires only that the district court determine after rigorous analysis whether the common question predominates over any individual questions." *Id.* at 669. The model, once run, will answer the common question of whether Apple's conduct caused class members to suffer an antitrust injury. At this juncture, the Court cannot "flatly reject" class certification because the pre-run model shows an estimated 7.9% of the class is uninjured. *See id.,* n.14.

For those reasons, plaintiffs' motion for class certification is **GRANTED.**

### C. APPOINTING CLASS REPRESENTATIVES AND CLASS COUNSEL

In its Previous Order, the Court noted that the proposed Class Representatives—plaintiffs Stephen H. Schwartz, Edward W. Hayter, Robert Pepper, and Edward Lawrence—were each both typical and adequate. (Previous Order at 20.) Consumer plaintiffs now move to appoint them as class representatives. Apple does not oppose. The motion to do so is **GRANTED.**

The Court also noted, in its Previous Order, that it had "no concerns" regarding the adequacy of Wolf Haldenstein Adler Freeman & Herz LLP and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. to serve as co-class counsel. (Previous Order at 20 n.11.) Consumer plaintiffs move to appoint Wolf Haldenstein and Kellogg Hansen as co-class counsel. Apple, again, does not oppose this request. The motion in this respect is also **GRANTED.**

## IV. CONCLUSION

For the foregoing reasons, Apple's *Daubert* motion is **DENIED** and plaintiffs' motion for class certification is **GRANTED.**

The Court sets a Case Management Conference for February 26, 2024, at 2:00 p.m. on the Zoom platform. Parties shall meet and confer on a schedule for the balance of the action. By no later than February 16, 2024, the parties shall file a joint statement with the proposed schedule including (i) the *earliest* date by which they will be in a position to file all remaining motions, including trial-related motions, (ii) any trial conflicts within six (6) months thereafter; and (iii) the timeframe within which Professor McFadden will run his model on the rest of the App Store

transactional data and whether the model can successfully ascertain the number of uninjured class members and limit them.

This Order terminates Docket Nos. 683, 690 and 786.

**IT IS SO ORDERED.**

Dated: February 2, 2024

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

# ADDENDUM VOL II
# FILED UNDER SEAL